851 So.2d 1055 (2003)
STATE of Louisiana
v.
Sedwric E. CLARK.
No. 2002-KA-1463.
Supreme Court of Louisiana.
June 27, 2003.
Rehearing Denied September 5, 2003.
*1061 Christopher Eades, David L. Koen, R. Neal Walker, New Orleans, Counsel for Applicant.
*1062 Richard P. Ieyoub, Attorney General, William R. Coenen, Jr., District Attorney, Penny Wise-Couciere, Rayville, John M. Lancaster, Counsel for Respondent.
KIMBALL, J.
This is a direct appeal under article V, section 5(D) of the Louisiana Constitution. The defendant, Sedwric E. Clark, was indicted by a grand jury for the first degree murders of Bertha Lee Anderson and Mariah Barnes. Following a trial, a jury found the defendant guilty on both counts and recommended sentences of death as to each count. The trial court sentenced the defendant to death in accordance with that recommendation. In his appeal to this court, the defendant raises fifteen separate assignments of error. After a thorough review, we conclude that none of the assignments or error raised by the defendant merits reversal, and we therefore affirm the defendant's convictions and sentences.

FACTS AND PROCEDURAL HISTORY
On February 13, 2000, a home health nurse making a routine visit to the residence 68-year-old Bertha Anderson in Oak Grove, Louisiana, discovered Anderson's bloodied body on the floor of her bedroom. Anderson had been beaten, choked, and stabbed. The autopsy revealed that there were large areas of bruising around the face, eyes, and neck. Anderson received a puncture wound on her right cheek. Her ribs and jaw had been broken, and the facial bones around the orbits and her nasal bone were fractured. In addition, the autopsy revealed that Anderson had been stabbed four times in the neck with such force that her spinal cord and both jugular veins had been severed. Neighbors and family soon gathered at the residence and alerted police that Mrs. Anderson's eight-year-old great-granddaughter, Mariah Barnes, who also lived at the residence, was missing.
Defendant, Barnes's father, gathered with others at the scene. The crowd grew hostile towards defendant, in all likelihood due to his volatile relationship with Anderson stemming from her refusal to allow him unsupervised visits with his daughter. Officers placed him in a police cruiser, and defendant agreed to accompany them to the West Carroll Parish Sheriff's Station so that he could assist the authorities in the search for his daughter. Before talking to the defendant, both Chief Criminal Deputy Louis Russell and Deputy Garland Walker gave the defendant Miranda warnings, which defendant knowingly and voluntarily waived. The deputies observed scratches on defendant's face and neck. When asked about their origin, defendant stated that they had been sustained the night before during a rough sexual encounter with a woman named Cocoa, whose birth name officers later clarified was Conita Ward, or possibly from an altercation he had had with his girlfriend. The deputies also noticed scratches on defendant's hands, but defendant refused to allow a search of his body for other scratches. Defendant told the officers that he had spent time with his daughter the day before, purchasing her a bicycle and some new shoes and later watching television with her at Anderson's residence until approximately 10:00 p.m. Defendant denied any knowledge concerning the circumstances of Anderson's death or his daughter's whereabouts, and the police released him. During the interview, defendant signed a consent form to search his house and car in hopes of finding Barnes. The officers' search, however, was unsuccessful. Defendant later signed a consent to search his Peterbilt truck. Russell and Trooper Neal Harwell of the Louisiana State Police, who had been dispatched after Russell requested assistance from the State Police Bureau of Investigation, accompanied defendant to search the *1063 truck. Defendant opened the truck, and the officers found no signs of Barnes. Defendant also consented to the seizure of the clothes that he wore the night of Barnes's disappearance, which were located in the washing machine at the residence of his girlfriend's parents in Lake Providence, where defendant and his girlfriend had slept the night before.
Despite the fact that his daughter was missing, the following morning, February 14, 2000, defendant asked his pregnant girlfriend, Malisha Green, to accompany him on a shopping trip to Vicksburg, Mississippi. Defendant drove through Vicksburg, telling Green he wanted instead to go to a shopping mall in Jackson, Mississippi. Upon arrival in Jackson, defendant proceeded directly to the Greyhound bus station and boarded a bus bound for New York City. He told Green that he did not want to return to jail for crimes he did not commit and that he knew police would blame him for Anderson's murder and Barnes's disappearance. Green drove defendant's vehicle back to her parents' house. Accompanied by her mother, Virginia Green, she then notified the West Carroll Parish Sheriff's Office about the circumstances of defendant's suspicious departure.
At the time of his attempted travel to New York, defendant was on parole for previous convictions. The authorities consulted with his parole officer and learned that the unauthorized trip violated the terms and conditions of his release. The officers then obtained a warrant for defendant's arrest based upon his parole violation.
The FBI participated in the apprehension of defendant when it learned that the case involved a possible kidnapping in which the suspect had crossed state lines. The Monroe office of the FBI learned that the bus defendant had boarded would make a scheduled stop in Atlanta at approximately 10:45 p.m. on February 14, 2000. FBI Special Agent Jeffrey Holmes was contacted in his Atlanta home and agreed to meet the bus at its scheduled stop. Holmes approached defendant, placed him under arrest, and brought him to a transit police station located across the street from the terminal. Defendant knowingly and voluntarily waived his Miranda rights and gave a statement about the offense in which he indicated that an unknown male was at Anderson's home when he left the residence at approximately 10:00 p.m. the night before her body was discovered. Defendant could not identify nor did he know the name of this other man. When asked of the apparent scratches on his face, defendant explained they were a result of an argument between him and Green.
The following morning, Holmes interviewed defendant a second time along with FBI agent May Jo Onusko in a cell at the Fulton County, Georgia jail. Defendant again was given his Miranda warnings, but he knowingly and voluntarily agreed to speak with the agents. This time, defendant told the officer that he went to Anderson's residence and found her arguing with the unknown man. When defendant approached her, Anderson grabbed at him, and the unknown man began to choke her. He admitted that Anderson had caused the visible scratches on his face but claimed that he had not killed her. Defendant was unable to provide the agents with an identification of the unknown attacker. He also admitted that he returned to Anderson's house after he left at 10:00 p.m. and that the unidentified male was still at the residence. Defendant stated that he also believed this man strangled Anderson. Defendant claimed that this man had abducted his daughter and described for Holmes where he thought that her body could be found.
*1064 Holmes interviewed defendant a third time later that afternoon in an office at the jail in an effort to elicit more information concerning the location of Barnes's body.[1] Holmes again advised defendant of his Miranda rights. This time, defendant described the unknown male in Anderson's home as a six-foot tall, 160 pound African-American male in his late 30s with a dark complexion and slender build. Defendant claimed that he returned a telephone call from the unknown assailant, but he could not provide the number to Holmes. According to defendant, the assailant informed him that he had shot his daughter and told defendant where her body could be found. Defendant then claimed that he and the other man had planned the murder of Anderson so that he could rescue Barnes and that Barnes was to be out of the house before the other man actually killed Anderson. Defendant asserted he became involved however because the "other dude" was too weak and "couldn't handle it." Defendant then said that he knew where Barnes's body was located and drew a map in which he indicated the exact location where his daughter's body could be found. At approximately the same time that defendant drew the map, a telephone repairman discovered Barnes's body in some weeds south of Holly Ridge Road in Richland Parish. She had been raped and shot in the head with a .22 caliber pistol.
Defendant waived extradition and was transported from Atlanta back to West Carroll Parish. There, after being given and having waived his Miranda rights, he gave a lengthy recorded confession in which he admitted being the sole assailant, murdering Anderson before abducting Barnes, and attempting to rape and finally killing Barnes.
Based on the confession and corroborating physical evidence, police learned that on February 12, 2000, defendant spent much of the day with his daughter. According to his confession and the testimony of his girlfriend, Malisha Green, defendant and Green went to Oak Grove. Defendant, accompanied by Barnes's cousin Toni Anderson, took Barnes to Wal-Mart and bought Barnes a promised bicycle and some sandals. After returning to Anderson's house, defendant then picked up Green, who had stayed behind at defendant's house. Defendant and Green then proceeded to Monroe so defendant could see a dentist and shop at the mall, where he bought Barnes a necklace. Defendant, Green and a relative of Green, Derrick Cottress, then returned to Oak Grove. Defendant brought Green and Cottress to another residence, and defendant went to Anderson's house to give the necklace to Barnes. After giving Barnes the necklace, defendant claimed that she insisted that he take her for a ride in his car. Defendant stated that they drove slowly because Barnes was sitting in his lap and driving. Defendant admitted that he then "started touching her and stuff...." Defendant then returned Barnes to Anderson's house and picked up Green and Cottress and went to Lake Providence.
Early that evening, defendant and Green had an argument when defendant told her he wanted to return to Oak Grove and go out on the town. En route to Oak Grove, defendant stopped at a liquor store where he met up with Conita Ward. He and Ward then had sexual intercourse. After arriving in Oak Grove and stopping at a house of a relative of Anderson, defendant went to Anderson's house and watched television with Barnes. Defendant *1065 departed at approximately 10:00 p.m. after Anderson asked that he leave so that they could go to sleep. He went to his house where he smoked marijuana and watched a pornographic video tape. Defendant became aroused and returned to Anderson's residence, entering through her carport door, which he knew had a faulty lock. He found Barnes awake in the bed she shared with her great-grandmother and beckoned her to the living room. Upon defendant's request, his daughter removed her panties at the bedroom door and entered the living room, where he began to molest her. At some point, Anderson awoke and found defendant at the residence. Defendant then attacked the elderly woman in her bed, choking her. During the struggle, defendant went to the kitchen and retrieved a knife. Defendant then returned to the bedroom and stabbed Anderson four times in the neck area, causing her to bleed to death. Defendant admitted that he lost his Indian coin ring and his gold chain with a cross pendant during his struggle with Anderson.
After killing Anderson, defendant stated that he "grabbed little Mariah," and took her on foot to his residence located nearby. Defendant discarded the knife used in the attack in a field behind Anderson's house. With his daughter in tow, defendant drove to the home of Green's parents in Lake Providence, where he learned that his girlfriend was possibly in labor and had gone to the hospital in Monroe. Leaving Barnes in the car, defendant returned briefly to his home to collect some of his belongings and a new shirt and pair of socks for Barnes and then began to drive to the hospital in Monroe. On the way to the hospital, defendant stopped his vehicle on Holly Ridge Road, between the railroad tracks and the Interstate 20 exit in Richland Parish. Defendant claimed he then tried to penetrate his daughter, who was still nude from the waist down. Defendant then continued to Monroe. Realizing that he could not take his daughter to the hospital with him after "what [he] had just tried to do," defendant returned to the same spot at which he had stopped earlier. After Barnes stated she wanted to visit her granny in Heaven, as defendant claimed, defendant took his daughter out of the car and shot her in the head with his.22 caliber pistol. Defendant then dumped her body into a gully where it was discovered days later.
Defendant arrived at the hospital in Monroe the morning of February 13, 2000, at approximately 1:00 or 2:00 a.m. Defendant had scratches on his face and wore different clothes than those he had on earlier. According to Green, however, defendant did not appear to be intoxicated or otherwise out of control.
On April 6, 2000, a West Carroll Parish grand jury indicted defendant for two counts of first degree murder for the homicides of Bertha Lee Anderson and Mariah Barnes in violation of La. R.S. 14:30. On June 2, 2000, the state alerted the court that it intended to seek the death penalty. On December 6, 2000, the trial court conducted a hearing on state and defense motions for a change of venue, which the court granted, ordering that the trial be moved from West Carroll Parish to Richland Parish. The court of appeal denied defendant's writ. State v. Clark, 34,872 (La.App. 2 Cir. 1/25/01). This court also denied defendant's writ. State v. Clark, 01-0339 (La.3/16/01), 787 So.2d 319.
At trial, the state introduced considerable physical and scientific evidence corroborating defendant's confession. Susan Cook, the home health nurse who found Anderson's body, testified that the bloodied body lay beside Anderson's bed next to the bedroom door. West Carroll Parish Chief Criminal Deputy Louis Russell testified that upon being summoned to *1066 Anderson's house, he took several pictures of the crime scene that show Anderson's body lying in front of a night stand next to her bed in her bedroom. He also attested that several pieces of evidence were found underneath the body, including Anderson's dentures, diamond stud earrings, a hearing aid, and a pair of bloodied child's panties. He further took pictures of a gold chain that was lying on Anderson's pillow.
Adam Becnel and George Schiro, forensic scientists at the State Police Crime Laboratory in Baton Rouge, examined the crime scene at Anderson's house the next day. They collected the panties that were near the bedroom door and the dentures in front of a night stand next to her bed. The investigators retrieved defendant's Indian coin ring on Anderson's night stand next to her bed and defendant's gold necklace broken mid-chain on the pillow on her bed. They found a piece of a torn fingernail at the foot of the night stand. Upon examining the blood splatters in the bedroom, Schiro determined they were consistent with medium velocity blood splatters, which are usually associated with stabbings and beatings.
Becnel and Schiro also examined the area where Barnes's body was found in Richland Parish. They found Barnes semi-dressed, wearing only two pairs of socks and two shirts. Upon examining her head, the scientists found a small hole that had blood and other discoloring, either soot, char, or burns, around its margin. After Barnes's body was transported to the funeral home, Schiro took a vaginal swab and fingernail scrapings from both hands.
Becnel and Schiro then examined defendant's car. Inside the car, the investigators found a towel on the passenger seat and a .22 pistol inside a holster-like apparatus underneath the driver's seat. After this search, Becnel and Schiro proceeded to defendant's house. Inside the home, they noticed and took a swab of a small amount of substance that looked like blood in the bathroom sink.
Chief Johnny Moss of the Oak Grove Police Department testified that on February 17, 2000, Russell asked him to go to Anderson's residence to look for the knife used in Anderson's murder. Moss stated he found the knife in a ditch containing rainwater that ran behind the house. Moss summoned Russell who then recovered the knife.
Dr. Steven Hayne, a state pathologist for the Department of Public Safety, performed an autopsy of Anderson. During his examination, he noted a tear of a fingernail on the right hand. He also took fingernail scrapings from both the left and right hands along with a vial of blood. When questioned about the wounds on Anderson's neck, Hayne testified that they were consistent with those that could be inflicted by a knife like the one Russell recovered when held by a left-handed person who was facing Anderson.
Hayne also performed an autopsy on Barnes's body. He determined the cause of death of Barnes was a contact gunshot wound to the back of the head because of the presence of powder residue underneath the scalp. Upon examining the body, Hayne noted that there were abrasions and bruises on the body, which indicated blunt force trauma injuries. He also examined Barnes's genitalia, noting there was some bruising and scraping of the skin, some tearing of the hymen, and a small amount of blood in the vaginal bulb, which according to Hayne, indicated penetration. Finally, during the autopsy, blood, vaginal and anal swabs were taken.
Michelle Gaines, a forensic DNA analyst at the North Louisiana Criminalistics Laboratory in Shreveport, Louisiana, testified that samples of blood taken from the defendant, Anderson and Barnes were compared with left and right fingernail scrapings *1067 from Anderson and Barnes, vaginal and anal swabs from Barnes, swabs taken from defendant's firearm, suspected blood taken from the bathroom of the defendant's residence, the towel found in the defendant's car, defendant's clothing taken from the home of the parents of Malisha Green, and the knife Russell retrieved. Gaines explained that PSA[2] was found on the vaginal and anal swabs taken from Barnes. Because there was no DNA material other than that of Barnes on the swabs, however, Gaines could not particularize the source of the PSA though she noted it was more likely from a male than a female. Gaines next testified that the blood found in the barrel of defendant's pistol matched the genetic profile of Barnes. She stated that the probability of finding this same DNA profile in an African American individual other than Barnes was approximately one in 248 trillion.
Gaines also testified regarding the DNA profile of the fingernail scrapings taken from both Anderson and Barnes. She noted that the scrapings from the right hand of Anderson matched the genetic profile of the defendant. She explained the likelihood of finding the same DNA profile from an African American individual other than defendant was approximately one in 8.3 quadrillion. Gaines noted that she also obtained a profile of the source of the material found underneath the fingernails of Anderson's left hand, but it was not consistent with that of defendant. Only Barnes's genetic material matched the scrapings taken from her fingernails. Gaines next testified that the swab taken from the defendant's bathroom sink contained DNA from at least three people. Because of the difficulty of identification in a mixed sample, Gaines attested that the genetic profiles of Anderson and the defendant could not be excluded from this swab; thus, Anderson and the defendant could have possibly contributed to the DNA in that sample. Gaines then testified that the DNA found on the towel recovered from defendant's car was not consistent with the genetic material of Anderson, Barnes, or defendant, but it was consistent with that of a female in general. In addition, Gaines explained that the person whose DNA was found on the towel could not be excluded from the possibility of being a contributor to the swab taken from the defendant's sink.
Finally, Gaines testified as to the testing of the clothes and the knife. After a visual examination of the clothes, Gaines stated she did not find anything significant such as blood that warranted further testing. She explained that it would be possible that washing had removed the blood on the clothes and prevented its visual detection. While Gaines did not see any blood on the knife, she stated that she took a swab of the blade and performed a DNA analysis, but she was unable to get a DNA profile. She explained that this result would not be unusual if the knife had been retrieved from a ditch containing water after several days.
After a trial, the jury unanimously found defendant guilty as charged on both counts on November 8, 2001. The jury determined that the defendant should receive the death penalty based on their finding of five aggravating circumstances as to each murder.[3]See La.C.Cr.P. art. 905.4(A)(1), *1068 (4), (7), (8), (10). Notably, during the penalty phase, the defendant took the stand against counsel's advice, confessed to the crimes, and asked the jury to "give this family what they deserve and the answer they're looking for" so that the family could "heal" and "move on." Defendant filed a Motion for New Trial, which the trial court denied, finding the verdict was in accordance with the law and the evidence presented at trial. Defendant also filed a Motion in Arrest of Judgment, arguing the West Carroll Parish grand jury was without jurisdiction to file an indictment with regard the first degree murder of Barnes because that murder occurred in Richland Parish. The trial court denied the motion, finding the West Carroll Parish grand jury had authority to return an indictment on both counts of murder. As to the count of first degree murder of Barnes, the trial court determined that one or more of the elements of the offense of first degree murder occurred in West Carroll Parish even though the actual killing occurred in Richland Parish. On January 9, 2002, the trial court formally imposed the death sentence on the defendant. The defendant then filed a direct appeal in this court, based on fifteen assignments of error.[4]

LAW AND ANALYSIS
As an initial matter, defendant filed a motion with this court to supplement the record with items that were not included in the trial record. We granted this motion in part, allowing defendant's memorandum in support of motion for change of venue and a series of newspaper reports to be filed in the record on appeal. We denied the motion in part, referring to the merits the motion to enlarge the record on appeal with documents not filed in the record below. The documents sought to be introduced into the record relate to defendant's arguments on appeal pertaining to the issue of whether Richland Parish was a proper venue. However, the defendant had the burden of proof below and was afforded a hearing. Defendant also could have filed a new motion for change of venue once the case was transferred to Richland Parish, subject to the discretion of the trial court and before the first witness was sworn but failed to do so. La. C.Cr.P. art. 621. He then could have introduced the instant evidence in support of his claim. It was therefore defendant's obligation to supplement the record in West Carroll Parish or reurge the issue in Richland Parish supported by any evidence of his claim of improper venue, and he failed do so. Thus, we will not consider it here, and defendant's motion is denied. State v. Cosey, 97-2020, p. 13 (La.11/28/00), 779 So.2d 675, 683-84.
In response to defendant's motion, the state filed a corresponding motion to *1069 supplement the record with evidence that it adduced to refute defendant's evidence presented in his motion. Because this evidence was not introduced in the trial court, it will not be considered as part of this appeal. State v. Langley, 95-1489, p. 14 n. 14 (La.4/3/02), 813 So.2d 356, 366 n. 14. Accordingly, the state's motion is denied.

Venue Issues

Assignment of Error No. 1
In his first assignment of error, defendant claims that the trial court erred when it moved his trial from West Carroll Parish to neighboring Richland Parish, where Barnes was actually shot and killed. Given that the parishes share a judicial district and their proximity to each other, defendant maintains that "[t]raveling the forty-odd miles down La. 17" did little to protect him from the poisonous influence of the pre-trial publicity that surrounded the crimes.
Because of the media coverage about the murders, both the state and defense filed motions for a change of venue. At a hearing on the motions, the state sought to move the trial to neighboring Richland Parish, while defendant maintained that publicity about the case had made a fair trial anywhere in the northern portion of the state impossible. The trial court granted the motions, choosing to hear the case in Richland Parish and ruling as follows:
It is one of the most basic and fundamental rights of any person charged with a crime to have the opportunity to be tried by a fair and impartial jury. And of course, this defendant is entitled to that same right. This Court is convinced that this defendant would not be able to be tried in a fair manner in West Carroll Parish. Apparently both the State and the Defense are of that opinion. And so because of the mandates of Article 6:22[sic] of the Louisiana Code of Criminal Procedure, The Court therefore rules and orders that the venue of this trial be moved to another parish. I have read and I also take the paper in Richland Parish. I take the News Star World and I take the West Carroll Gazette myself and I read those papers. I was privy and I didI think I heard either all of the news broadcasts on KNOE, or at least most of them and I might have picked up on one of them on KTVE. So, I have been privy to those broadcast. I believe that the defendant can have a fair and impartial trial in Richland Parish, Louisiana. I'm going to order that the trial be moved to Richland Parish within this district.
Defendant sought review of the trial court's ruling in the court of appeal and in this court, both of which denied writs. State v. Clark, 34,872 (La.App. 2 Cir. 1/25/01);[5]State v. Clark, 01-0339 (La.3/16/01), 787 So.2d 319. Nonetheless, this court's failure to intervene pre-trial does not bar consideration of the merits of the issue on direct appeal. State v. Fontenot, 550 So.2d 179 (La.1989).
A defendant is guaranteed an impartial jury and a fair trial. La. Const. art. 1, § 16; State v. Brown, 496 So.2d 261, 263 (La.1986). To accomplish this end, the law provides for a change of venue when a defendant establishes that he will be unable to obtain an impartial jury or a fair trial at the place of original venue. State v. Frank, 99-0553, p. 11 (La.1/17/01), 803 So.2d 1, 12 (citations omitted).
*1070 Changes of venue are governed by La. C.Cr.P. art. 622, which provides,
A change of venue shall be granted when the applicant proves that by reason of prejudice existing in the public mind or because of undue influence, or that for any other reason, a fair and impartial trial cannot be obtained in the parish where the prosecution is pending.
In deciding whether to grant a change of venue, the court shall consider whether the prejudice, the influence, or the other reasons are such that they will affect the answers of jurors on the voir dire examination or the testimony of witnesses at the trial.
La.C.Cr.P. art. 622.
In State v. Frank, we thoroughly examined the law pertaining to change of venue and Article 622. We noted Article 622 was adopted in 1966 and changed the test previously used by courts. Frank, 99-0553 at pp. 11-12, 803 So.2d at 12-13 (citing State v. Bell, 315 So.2d 307, 309 (La.1975)). We also observed that subsequent to the adoption of Article 622, this court in Bell enumerated several relevant factors that would help guide the judiciary in determinations of whether to change venue under Article 622. Those factors are: (1) the nature of pre-trial publicity and the particular degree to which it has circulated in the community, (2) the connection of government officials with the release of the publicity, (3) the length of time between the dissemination of the publicity and the trial, (4) the severity and notoriety of the offense, (5) the area from which the jury is to be drawn, (6) other events occurring in the community which either affect or reflect the attitude of the community or individual jurors toward the defendant, and (7) any factors likely to affect the candor and veracity of the prospective jurors on voir dire. Bell, 315 So.2d at 311.
In Bell, the court instructed that under the new provision, it was no longer appropriate for a trial court to inquire only as to whether the individual prospective jurors could be fair and impartial and uninfluenced by what they had heard or had seen outside the court. Id. at 313. The focus must extend beyond the prejudices and attitudes of the individual venire persons, and the defendant must be allowed to show that, even if it would be possible to select a jury whose members were not subject to a challenge for cause, that there exists prejudice or influences within the community at large that would affect the jurors' answers during voir dire or the testimony of witnesses at the trial, or that for any other reason, a fair and impartial trial could not be held in the parish. Id. The trial court's ultimate determination must be of the community's attitude toward the defendant. Id.
Subsequent to Bell, we reiterated that the fact that a jury can be selected, i.e., that the requisite number of jurors are not subject to a valid challenge for cause, does not mandate the conclusion that a motion for change of venue was properly denied by the trial court. State v. Rudolph, 332 So.2d 806, 809 (La.1976). We explained that a change of venue may be necessary to ensure a fair trial even if, individually, each juror is not susceptible to a valid challenge for cause, because the overriding state of the public mind against the defendant may cause the jurors not to answer completely and honestly during voir dire. Id.
Despite the substantive change to Article 622, the burden of proof remains on the defendant to show that there exists such prejudice in the collective mind of the community that a fair trial is impossible.[6] *1071 State v. Vaccaro, 411 So.2d 415, 424 (La. 1982). Whether the defendant has made the requisite showing is a question addressed to the trial court's sound discretion which will not be disturbed on review in the absence of an affirmative showing of error and abuse of discretion. Id.
Both this court and the United States Supreme Court have instructed that the defendant cannot meet his burden merely by showing that there exists public knowledge of the facts surrounding the offense or the alleged offender. Frank, 99-0553 at p. 14, 803 So.2d at 14, 15. As the Supreme Court noted in 1961, "[i]n these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity...." Irvin v. Dowd, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961). The defendant must prove more than mere public knowledge or familiarity with the facts of the case to be entitled to have his trial moved to another parish; rather, the defendant must show the extent of prejudice in the minds of the community as a result of such knowledge or exposure to the case before trial. Frank, 99-0553 at p. 14, 803 So.2d at 15. Thus, a defendant is not entitled to a jury entirely ignorant of his case and cannot prevail on a motion for change of venue merely by showing a general level of public awareness about the crime. State v. Thompson, 516 So.2d 349, 352 (La.1987), cert. denied, 488 U.S. 871, 109 S.Ct. 180, 102 L.Ed.2d 149 (1988).
On review of a denial of change of venue, courts will primarily inquire as to the scope and nature of publicity to which prospective jurors in a community have been exposed and examine the lengths to which a court must go to impanel a jury that appears to be impartial, in order to ascertain whether prejudice existed in the mind of the public which prevented the defendant from receiving a fair trial. See, e.g., Murphy v. Florida, 421 U.S. 794, 802-3, 95 S.Ct. 2031, 2037, 44 L.Ed.2d 589 (1975), State v. Hoffman, 98-3118 (La.4/11/00), 768 So.2d 542, cert. denied, 531 U.S. 946, 121 S.Ct. 345, 148 L.Ed.2d 277 (2000). The seven factors enumerated by this court in Bell help facilitate the inquiry into the nature and scope of publicity disseminated in the community where a crime occurred. Courts must distinguish, however, largely factual publicity from that which is invidious or inflammatory, as they present real differences in the potential for prejudice. Murphy, 421 U.S. at 800-1 n. 4, 95 S.Ct. at 2036 n. 4.
Additionally, courts have examined the number of jurors excused for cause for having fixed an opinion as another gauge of whether prejudice exists in the public mind. Id. at 803, 95 S.Ct. at 2037-38; State v. Wessinger, 98-1234, p. 7 (La. 5/28/99), 736 So.2d 162, 173, cert. denied, 528 U.S. 1050, 120 S.Ct. 588, 145 L.Ed.2d 489 (1999). As the Supreme Court noted, in a community where the majority of prospective jurors will openly admit to a disqualifying prejudice, the reliability of other jurors' assurances that they are impartial and have no preconceived notion may be drawn into question. Murphy, 421 U.S. at 803, 95 S.Ct. at 2037. Yet, the mere existence of any preconceived notion as to the guilt or innocence of the accused, without more, is insufficient to rebut the presumption of the juror's impartiality. Id. at 800, 95 S.Ct. at 2036. "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the *1072 evidence presented in court." Id. (quoting Irvin, 366 U.S. at 723, 81 S.Ct. at 1642).
Thus, as we explained in Frank, there is not a bright line test for determining the degree of prejudice existing in the collective mind of the community. Frank, 99-0553 at p. 16, 803 So.2d at 16. There is no established minimum level of exposure to negative publicity or percentage of challenged jurors that illustrates a corruptive atmosphere mandating venue transfer. Id.; Hoffman, 98-3118 at p. 8, 768 So.2d at 555; Wessinger, 98-1234 at p. 7, 736 So.2d at 173. Therefore, we have advised that a comparison to other cases is proper when analyzing the question of whether a change of venue was required due to the number of prospective jurors whose ability to be impartial had been corrupted by publicity.[7]Frank, 99-0553 at p. 16, 803 So.2d at 16; Wessinger, 98-1234 at p. 7, 736 So.2d at 173.
Defendant urges that several Bell factors precluded him from receiving a fair trial in Richland Parish. First, defendant urges that the nature of pre-trial publicity and the degree to which it has circulated in the community violated his right to a fair trial in Richland Parish. In support of his claim, defendant notes that in the state's own motion for a change of venue, it conceded that newspapers in West Carroll and in its surrounding parishes had published numerous articles related to the crime, which included hearsay and other evidence that might not be admissible at trial. In defendant's memorandum in support of his motion for a change of venue, he argued:
The changing of venue to Richland or Franklin Parish, both of which are in the Fifth Judicial District, amounts to no change of venue at all. One of the alleged homicides, that of the defendant's daughter, is even alleged to have occurred in Richland Parish. If the prejudice in this case was so likely that even the [s]tate filed a motion for change of venue prior to that of the defendant, it is difficult to understand how trying the case in Richland Parish where one homicide is alleged to have occurred, would be justified. Moving the trial to Richland Parish would clearly be reversible error.
Defendant lodged several exhibits at the hearing in support of his motion, including a series of newspaper articles relating to *1073 the case. Among them were six days of articles about the crime appearing in the Monroe News-Star between February 15, 2000, and February 20, 2000.[8] Defendant also produced two editions of the weekly West Carroll Gazette published on February 16, 2000, and February 23, 2000, both of which feature the case as front page news. The defense also submitted the February 17, 2000, edition of the Richland Beacon News, which featured the crimes both on the front page and in an editorial. The latter item, entitled, Death too good for killer of little girl, concluded:
In this case, I think that whomever killed Mariah Barnes should be killed in a way that is 10 times the torture he visited on her four-foot-tall, 65-pound body.
Defendant also introduced a number of transcripts provided by KNOE-TV in Monroe, which indicated that the station had aired stories about the crimes on February 13, 2000, through February 15, 2000. Finally, defendant produced what appears to be an unsigned affidavit summarizing stories that appeared on KTVE-TV on February 14, 16, 18, and 19, 2000. On February 14, reports about the crimes aired on the 5:00 p.m., 6:00 p.m., and 10:00 p.m. news. On the latter dates, news concerning the investigation aired on the 10:00 p.m. edition and defendant was named as a suspect in the crimes.
The record reveals that 78 of the 124 prospective jurors examined (63%)[9] concerning their familiarity with the case responded that they had some exposure to it. While significant, this percentage is considerably smaller than that found in other cases in which this court has found no abuse of the trial court's discretion in denying a motion for a change of venue based on the number of prospective jurors familiar with the facts of the case. See, e.g., Frank, 99-0553 at p. 16, 803 So.2d at 16 (finding 110 out of 113 venire members had been exposed to some publicity surrounding the case). When questioned about the source of the information, most of the jurors replied they had heard of the case either on television or through conversation on the street or had read of the case in the newspaper. Of those examined, a small percentage of the venire was excused due to on an inability to judge defendant's guilt based on the evidence presented at trial. In fact, only seven members of the venire were challenged for cause based on their intractable opinion about defendant's guilt and only four of those challenges were granted.[10] This percentage of the total venire is far smaller than that seen in other cases in which this court has found the level of pre-trial publicity insufficient to warrant a change of venue. Id. (jurors who could not set aside pre-conceived negative opinion about the crime and were excused for cause approximated to be between 20% and 25% of total venire).
Defendant next asserts that Richland Parish was an improper venue because *1074 West Carroll Parish and Richland Parish officials were extensively quoted in the local media and played a significant role in the release of the publicity. The record reflects that in the initial press coverage of the murder, West Carroll Parish Sheriff Gary Bennett was quoted extensively right after the murders.[11] The record does not show any other comment by a public official after February 18, 2000. In addition, the trial judge on December 6, 2000 imposed a gag order at the hearing on the motion for a change of venue after moving the case to Richland Parish, prohibiting either side from talking to the press.[12] Thus, the only comments made by a public official connected with the case were those that occurred nearly twenty months before trial. Given the imposition of the gag order to prevent any further comments by the officials involved in the case and the extent of time between the publication of the comments and the trial and, defendant has failed to meet his burden of showing the comments prejudiced his right to a fair trial.
Defendant's next argument relates to the third Bell factor, the length of time between the publicity and the trial. Specifically, defendant complains that the jury venire was not sequestered during examination and selection, thus, the potential jurors had an opportunity to read newspapers and watch television between October 29, 2001, and November 5, 2001, which would have affected their views of the case.
The crimes occurred in the middle of February 2000, and the great majority of the publicity concerning the offense took place immediately thereafter. As noted above, the court imposed a gag order on December 6, 2000. However, before trial commenced, the venire was not sequestered between October 29, 2001, and November 5, 2001, the date the trial commenced. The record shows that at the outset of voir dire, the court instructed the venire to ignore any media relating to the case.[13] In addition, the court personally examined the selected jurors individually immediately before trial began to ensure that they had complied with his order. The record is devoid of any evidence that shows the venire was exposed to or influenced by pre-trial media. Thus, defendant has failed to show that the time between any pre-trial publicity and the date of his trial affected his right to an impartial jury.
Defendant further argues that the severity and notoriety of the offense warranted a change of venue other than to Richland Parish. For support of his argument, defendant notes that the prosecutor described this case as one of the worst crimes the area had ever witnessed.[14] At *1075 the venue hearing, however, the state argued that the court had tried several other high-profile cases in Richland Parish, citing, inter alia, the Caston brothers, State v. Caston, 26,415 (La.App. 2 Cir. 10/26/94), 645 So.2d 1202, writ denied, 94-3137 (La.5/5/95), 654 So.2d 337; State v. Caston, 583 So.2d 42 (La.App. 2 Cir.), writ denied, 585 So.2d 575 (La.1991); and State v. Cupit, 508 So.2d 996 (La.App. 2 Cir.), writ denied, 514 So.2d 1174 (La.1987), without incident. Defendant claims that those cases may be distinguished from his because none of those defendants received the death penalty and in fact did not even seek to move their cases out of the judicial district. In those cases, however, although the defendants received life sentences, the state sought the death penalty as the proper sentence. Because a motion for change of venue relates to the ability of a defendant to receive a fair trial on the charges brought by the state, the relevant inquiry when evaluating the comparative notoriety of the offenses would necessarily be the penalty sought by the state rather than that returned by the jury. Accordingly, there is nothing in the record that indicates that this case contained facts that were so severe or notorious so as to warrant a change of venue.
Defendant next asserts that Richland Parish is a small, rural parish so saturated with pre-trial publicity such that it could not be a proper venue.[15] Defendant notes that during voir dire, thirty-two members of the venire reported discussing the case with neighbors. In addition, two prospective jurors actually saw police vehicles at the crime scene, and one juror testified he drove past one of the crime scenes. Defendant also quotes the prosecutor, who, at voir dire, referred to discussion of the crime in the area with comments to prospective jurors such as, "[T]here's nothing wrong with about hearing about cases. In a small community like we all live in, that happens." Finally, defendant asserts that because West Carroll and Richland Parishes adjoin each other, the two parishes are too integrated such that Richland Parish was no more a proper venue than West Carroll Parish.
A more sparsely populated parish like Richland Parish arguably would be more focused on a violent crime than would be an urban community more acquainted with these misdeeds. Compare Hoffman, 98-3118 at p. 6 (La.4/11/00), 768 So.2d at 553 ("[T]his event must be viewed against the backdrop of fear and desperation caused by a crime wave that engulfed both St. Tammany and Orleans in November 1996."). However, if we were to adopt defendant's position, smaller parishes would essentially be prevented from being a proper venue for a capital case. A rural parish like Richland Parish is not an improper venue merely because of the local population's familiarity with the offense. The record does contain trace instances of integration between the two parishes, most likely because of their geographical proximity.[16] However, none of these instances demonstrates that Richland Parish could not present defendant with a fair and *1076 impartial jury. Accordingly, there is no evidence that shows that the size of Richland Parish prejudiced defendant's right to a fair trial. Thus, this argument is without merit.
Defendant next urges that other events occurred in the community that either affected or reflected the attitude of the community or individual jurors toward the defendant. Defendant does not point to any unrelated events that had any effect on the attitude of the community towards his crime. However, he refers to a number of incidents which demonstrated the outrage in the area about the crime.[17] Defendant claims that these events reflected an "air of vigilantism" in the community and they are discussed in detail in our review of the next assignment of error. The relevant incidents, however, all involve the victims' family and do not necessarily reflect the attitude of the community at large. Thus, this argument is without merit.
In his last argument relating to the Bell factors, defendant claims that in the close-knit and rural community, prospective jurors were unable to give honest responses when examined at voir dire. In support of his argument, defendant points to the large percentage of jurors who had ties to law enforcement agencies or the district attorneys' offices prosecuting the case.[18] A review of the record shows that these relationships were tenuous at best. Furthermore, the jurors were questioned whether their relationship would hinder their ability to impartially consider the evidence. While all of the jurors indicated their relationships would not influence their decision, the trial court determined that it was necessary to excuse only one juror based on her relationship to a witness at trial.[19] Thus, she was properly excused for cause because of the relationship. Moreover, four jurors were also excused based on their relationships to the West Carroll and Richland Parish Sheriff's Offices and the Assistant District Attorney.[20] Accordingly, defendant's claim that these relationships affected those veniremembers' responses during voir dire thus lacks support in the record.
Finally, in an argument unrelated to the Bell factors, defendant claims that the state sought to keep the trial in the Fifth Judicial District for the convenience of the witnesses and the victims' family. The record does reflect instances in which the prosecution argued that Richland Parish *1077 would be convenient. At the hearing on the motion to transfer venue, however, the district attorney also acknowledged that he would "not say for one second that judicial economy should prevail over the rights of a defendant."
While the record demonstrates that there was a general knowledge within Richland Parish about the case in general, the defendant has failed to present sufficient evidence of an overriding prejudice within that community's collective mind that prevented him from receiving a fair trial. Most jurors who recalled some memory of the publicity responded that they were aware of the case but could put aside that information and act impartially as a juror. Those jurors who expressed a pre-conceived opinion that could not be set aside were excused for cause. Those prospective jurors only made up approximately three percent of the total venire. We have approved several rulings in which the trial court has denied a defendant's motion for a change of venue in cases in which a far larger percentage of prospective jurors indicated an inability to set aside pre-formed opinions of the defendant's guilt. See Frank, 99-0553 at pp. 16-18, 803 So.2d at 16-17, Hoffman, 98-3118 at pp. 9-10, 768 So.2d at 555-56; Connolly, 96-1680 at p. 5, 700 So.2d at 815; Wilson, 467 So.2d at 513. Furthermore, because defendant fails to demonstrate that the trial court erred when it ordered the trial held in Richland Parish, the convenience of that venue for interested parties does not appear to be an inappropriate consideration. In conclusion, based on this record, we do not find that this is a case in which the trial court abused its discretion when it moved the trial from West Carroll Parish to neighboring Richland Parish.

Assignment of Error No. 2
In his second assignment of error, defendant argues that several incidents purportedly demonstrate a "threat of vigilante-style justice" that cast "an ugly and unconstitutional pall over the proceedings leading to [his] convictions and death sentences." Accordingly, he claims that he was denied due process, and thus this court should set aside his convictions or at the very least the death sentences imposed in the instant case.
Defendant points to several incidents that occurred following the murders to illustrate the atmosphere in the community preceding his trial.[21] First, on the day after Anderson's body was discovered, defendant was placed in a police vehicle outside the victims' residence. Deputy Garland Walker testified that a crowd gathered around the vehicle, and he instructed the officer at the scene, Robert Epting, to transport defendant to the sheriff's office. On cross-examination, Walker described the scene, stating that Edward Anderson, a relative of Bertha's, ran to Epting's car along with two other men, pointed to defendant, and yelled, calling him a "son-of-a-bitch." Deputy Kenneth Green also testified on cross-examination that upon exiting Anderson's house when he heard the commotion, he observed Epting's car was surrounded with "[m]aybe twenty people," who were screaming, beating the car, and trying to get to defendant. Given the atmosphere, the officers "thought it necessary" to "remove [defendant] from the area."
Defendant also refers to a letter written by the warden of the jail located in West Carroll Parish to officials at the Hunt Correctional Center, requesting that defendant be housed at the out-of-town facility *1078 because "the victims' family would like to do him harm."[22] Based on these episodes, defendant claims that "[i]f the local constabulary was unable to protect [him] from physical danger, the record reveals that the trial court and prosecution were hardly equipped to protect [his] right to due process of law once the proceedings began in court."
These isolated events fail to demonstrate that defendant's due process rights were in any way compromised in the courtroom. The threatening incidents all involved the victims' family members and their visceral reactions to the murders of their loved ones, which could hardly have been unexpected. This evidence does not show that the community of Richland Parish held an animosity against defendant such that his right to a fair trial was prejudiced. Thus, this portion of defendant's argument lacks merit.
Defendant next complains about unbridled displays of emotion in the courtroom. The record shows that while defendant's recorded confession was played to the jury, defendant's aunt, left the courtroom without incident. Shortly thereafter, Kimberly Dobbins, a relative of the victims, exited the courtroom without incident. During a hearing relating to the trial disturbances, Dobbins explained the she was a diabetic, had not eaten anything that morning, and left to get a Coke or a peppermint. Minutes later, Barnes's mother and Anderson's granddaughter, Shalaina Smith, fainted. Defendant moved for a mistrial, which the trial court denied, describing the interruptions as minimal.[23] At the state's request, when jurors returned to the courtroom, the court admonished them and instructed them to base their decision solely on the evidence presented and not on any events in the courtroom.[24]
*1079 La.C.Cr.P. art. 775 requires a mistrial on motion of the defense when "prejudicial conduct inside or outside the courtroom makes it impossible for the defendant to receive a fair trial." However, mistrial is a drastic remedy that is warranted only when the defendant has suffered substantial prejudice such that he cannot receive a fair trial. Wessinger, 98-1234 at p. 24, 736 So.2d at 183; State v. Bates, 495 So.2d 1262, 1273 (La.1986); State v. Wingo, 457 So.2d 1159, 1166 (La. 1984). The determination of whether actual prejudice has occurred lies within the sound discretion of the trial judge, and this decision will not be overturned on appeal absent an abuse of that discretion. Wessinger, 98-1234 at p. 24, 736 So.2d at 183; State v. Sanders, 93-0001,32 pp. 20-21 (La.11/30/94), 648 So.2d 1272, 1288; State v. Smith, 430 So.2d 31, 44 (La.1983).
In State v. Wessinger, the prosecutor played an audiotape of the victim's 911 call during the penalty phase of the trial. As the tape played, the victim's father shouted an expletive. The trial court removed the jury and the defendant from the courtroom and held a bench conference. Defense counsel moved for a mistrial based on the outburst, which the trial judge denied. We affirmed the defendant's conviction and sentence, stating it could presume that jurors viewed the outburst as "the natural and irrelevant expression of human emotion" and did not let it influence their verdict. Wessinger, 98-1234 at p. 24, 736 So.2d at 183.[25]
We cannot say that the trial judge abused his vast discretion in denying the mistrial at issue in this assignment of error. Defendant does not demonstrate, and we cannot ascertain from the record, how these events could have prejudiced him to such a degree that a mistrial was warranted. Even assuming that the jurors thought that the incidents were somehow related to the family's reaction to defendant's confession in which he graphically described the murders, he fails to make any reasonable showing that it unduly influenced their verdict. Furthermore, the trial judge admonished the jurors that they were to disregard any extraneous events that occurred inside the courtroom. Accordingly, this portion of defendant's argument also lacks merit.
In his next argument, defendant claims that the prosecutor made two improper statements during rebuttal at the guilt phase and at the penalty phase of the trial, which require reversal of his convictions and sentences. Defendant concedes and the record reveals that he failed to make a contemporaneous objection to either statement at trial. In these circumstances, he waived any claim based on *1080 them. La.C.Cr.P. art. 841; State v. Taylor, 93-2201, p. 7 (La.2/28/96), 669 So.2d 364, 369; Wessinger, 98-1234 at p. 20, 736 So.2d at 181. Accordingly, this portion of defendant's argument also lacks merit.
Finally, appellate counsel claims that defendant requested the death penalty when testifying at the penalty phase because the atmosphere at the proceedings caused him to fear that the victims' relatives would seek revenge on his family if jurors spared his life. The record shows that defendant took the stand at the penalty phase, against the advice of counsel, and requested that the jury sentence him to death so the victims' family could "heal" and "move on." Defendant also stated that he had spoken with his family about his decision to request the death penalty and that they understood. There is no suggestion that defendant feared the victims' relatives would seek retribution on his family if he received a life sentence. Accordingly, this claim lacks any basis in fact.
In conclusion, the record is devoid of any suggestion that defendant was denied due process as a result of the atmosphere either inside or outside the courtroom. Accordingly, defendant's argument that there was an air of vigilante-style justice that prejudiced his due process rights lacks merit.

Assignment of Error No. 4
In this argument, defendant argues that a West Carroll Parish grand jury indicted him for the murder of Mariah Barnes even though no element of the offense occurred in West Carroll Parish. Rather, defendant contends that all the elements of the first degree murder of Barnes occurred in Richland Parish. Thus, the West Carroll Parish was an improper venue because grand jury had no jurisdiction over defendant on this count and the resulting conviction is invalid.
A claim of improper venue is governed by La.C.Cr. P. art. 615, which provides:
Improper venue shall be raised in advance of trial by motion to quash, and shall be tried by the trial judge alone. Venue shall not be considered an essential element to be proven by the state at trial, rather it shall be a jurisdictional matter to be proven by the state by a preponderance of the evidence and decided by the court in advance of trial.
La.C.Cr.P. art. 615. By the clear language of this statute, a defendant must raise a motion to quash based on improper venue prior to trial. Accordingly, a defendant who fails to file his motion to quash prior to trial has waived his right to assert his claim of improper venue on appeal. See State v. Amato, 96, 0606 (La.App. 1 Cir. 6/30/97), 698 So.2d 972; State v. Gatch, 27,701 (La.App. 2 Cir. 2/28/96), 669 So.2d 676; State v. Matthews, 632 So.2d 294 (La.App. 1 Cir.1993).
In the instant case, the record does not reflect that defendant filed a pre-trial motion to quash the indictment based on jurisdiction. Defendant claims that he did not raise this issue pre-trial because the legal and factual intricacies of the case would have made it futile for the trial court to entertain the issue. Even assuming that defendant's allegations are true, the timing of when to raise the claim of improper venue is distinct from the difficulty of proving the claim. Defendant also urges that he preserved this issue when he filed a Motion in Arrest of Judgment after trial. However, La.C.Cr. P. art. 859 explicitly provides that "[i]mproper venue may not be urged by a motion in arrest of judgment." La.C.Cr.P. art. 859. Thus, because defendant did not file a motion to quash in advance of trial as required by statute, he waived the issue on appeal.

*1081 Guilt Phase Issues

Assignment of Error No. 7
In this assignment of error, defendant contends that the state violated his constitutional rights when it ordered him to provide biological evidence. Defendant claims that by compelling him to surrender samples of his blood and other biological materials for forensic analysis, the state violated the Fourth, Fifth, Sixth and Fourteenth Amendments of the United States Constitution.
It is well settled law that the Fifth Amendment privilege against self-incrimination only applies to evidence of a testimonial and communicative nature and is not violated by the gathering of physical evidence such as blood samples from the accused. Schmerber v. California, 384 U.S. 757, 761-764, 86 S.Ct. 1826, 1830-1832, 16 L.Ed.2d 908 (1966) ("privilege protects an accused only from being compelled to testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature ... privilege is a bar against compelling `communications' or `testimony,' but that compulsion which makes a suspect or accused the source of `real or physical evidence' does not violate it"); State v. Carthan, 377 So.2d 308, 312 (La.1979) ("[t]esting of bodily evidence ... violates no privilege against self-incrimination"). Similarly, the Sixth Amendment right to counsel does not apply to the scientific examination of a defendant's blood. United States v. Wade, 388 U.S. 218, 227, 87 S.Ct. 1926, 1932, 18 L.Ed.2d 1149 (1967) (scientific analysis of an accused's blood not a "critical stage" of proceedings at which constitutional right to counsel attaches).
A court-ordered blood test or medical procedure, designed to gather evidence against the person undergoing the procedure, constitutes a search and seizure under the Fourth Amendment and La. Const. art. I, § 5. Schmerber, 384 U.S. at 767, 86 S.Ct. at 1834; In the Interest of J.M., 590 So.2d 565, 569 (La.1991); Carthan, 377 So.2d at 311. Thus, to survive constitutional scrutiny, a blood test must be conducted pursuant to a warrant based on probable cause absent a recognized exception.
The record shows that the court held a probable cause hearing for defendant's arrest on the two counts of first degree murder. The judge subsequently signed an Order for Production of Physical Evidence, compelling defendant to submit to the taking of blood, saliva, and pubic and head hairs. While this order was not labeled a "warrant," it was issued with all of the safeguards that a warrant affords. A court issued the order, which allowed for a detached and disinterested determination of whether or nor not to invade defendant's body in search of evidence of guilt. See Schmerber, 384 U.S. at 770, 86 S.Ct. at 1835. The order was also based upon probable cause, which is the constitutional standard for a lawful search and seizure. Given the existence of probable cause and the court order, seizure of defendant's blood was therefore not unreasonable. Accordingly, this argument lacks merit.

Assignment of Error No. 14
In this assignment of error, appellate counsel claims that trial counsel introduced insufficient evidence to support defendant's dual plea of not guilty and not guilty by reason of insanity, effectively constituting an admission of guilt on his behalf in violation of La.C.Cr.P. art. 557.[26]
*1082 A defendant asserting that he was insane at the time of the offense may urge at trial all other defenses available under the law, including that the defendant did not commit the act, that he was justified by self-defense, and other possible defenses on the merits. State v. Branch, 99-1484, p. 2 (La.3/17/00), 759 So.2d 31, 32 (citing La.C.Cr.P. art. 552 cmt.). Once the state has established beyond a reasonable doubt all necessary elements of the offense and shown that defendant has committed a crime, the defendant bears the burden of establishing his defense of insanity in order to escape punishment. La.C.Cr.P. art. 652; State v. Marmillion, 339 So.2d 788, 796 (La.1976).
The record shows that the defense presented no evidence in support of the dual plea, the defendant did not withdraw the plea, and the trial court instructed jurors at the close of the guilt stage as to the defense of insanity in Louisiana.[27] The record is not void, however, of suggestions the defense counsel attempted to exploit the dual plea. During closing arguments at the penalty phase, defense counsel stated, "Nobody could do that to their own child in their right mind," which suggests that the jury should consider residual doubt about defendant's sanity before imposing its sentence.
Counsel's failure to present any affirmative evidence in support of the insanity portion of the dual plea, by either lay or expert testimony, does not amount to a tacit submission on the question of guilt or innocence. Jurors are allowed to consider all pleas of innocence and defenses and would not have necessarily considered failure to present evidence supporting the dual plea an admission of guilt. Given the dual nature of the plea, defendant's failure to present evidence of insanity did not amount to an unconditional plea of guilty in violation of La.C.Cr.P. art. 557. Accordingly, this argument lacks merit.

Penalty Phase Issues

Assignment of Error No. 3
In this assignment of error, defendant claims that the court denied him the right to present mitigation evidence at the penalty phase when it curtailed the scope of his expert's testimony. As a result, he alleges that jurors lacked crucial information concerning the costs associated with the imposition of the death penalty, rendering their verdict unreliable.
The record reveals that at the penalty phase, defendant called Burk Foster, a professor of criminal justice at the University of Louisiana at Lafayette. After the court qualified Foster as an expert in the field of corrections, counsel asked that he "tell the jury what will happen if Sedwric Clark is given the death sentence." The state objected, and the court excused the jury.
During the examination, Foster explained that in response to defense counsel's question, he would testify about the conditions that defendant would experience while on death row.[28] Foster also *1083 indicated that his testimony would include information regarding "the average length of time or how long someone stays on death row" and the "frequency and extent of use" of the governor's clemency and pardon powers. The trial court denied the state's objection and allowed the testimony, finding it to be relevant to defendant's sentencing.
Defense counsel then added that he wanted Foster to discuss "the cost of execution." When asked about that subject, the expert informed the court that while the exact cost of executions in Louisiana had never been calculated, there had been studies in other states that compared the cost of executions with the cost of life sentences. He further commented that, "generally speaking, executions cost twice as much to seven times as much as life imprisonment." The trial court ruled that it would not permit the expert to testify about the comparative costs of the imposition of a life as opposed to a death sentence and defense counsel objected. After a break, the state clarified its objection to the court, noting that it objected to testimony about the cost of an execution and not about the cost of incarceration. The court then ruled that it would allow Foster to testify as to the cost of a sentence of life imprisonment.
Defendant tendered the witness without further questioning. The state also indicated that it had no questions for Foster, and the court excused the witness. Jurors, therefore, learned nothing of substance from Professor Foster as to any aspect of capital punishment in Louisiana. Defendant now argues that "[i]n permitting the prosecution to adduce evidence about the cost of life imprisonment, but not of execution, the trial court arbitrarily tilted the playing field and thereby presented Mr. Clark in a no-win situation."
The scope of the sentencing hearing in a capital case is governed by La. C.Cr.P. art. 905.2, which provides that "[t]he sentencing hearing shall focus on the circumstances of the offense, the character and propensities of the offender, and the victim, and the impact that the death of the victim has had on the victim, family members, friends, and associates." La. C.Cr.P. art. 905.2. The trial court is to instruct the jury as to the governor's power to grant a reprieve, pardon or commutation of sentence. Id. Thus, the defense is allowed to argue or present evidence to the jury on the frequency and extent of use by the governor of his clemency authority. Id. Testimony concerning the costs associated with incarceration and the imposition of the death penalty do not relate to the circumstances of the offense, the character of the defendant, or the impact on the victims. Cf. State v. Langley, 95-1489 (La.4/14/98), 711 So.2d 651, conviction vacated on other grounds, 95-1489 *1084 (La.4/3/02), 813 So.2d 356 (finding in-depth evidence regarding the nature of the death penalty not relevant to the circumstances of the offense or the character of the defendant). It also does not bear upon the frequency and the extent of the governor's clemency powers.
Furthermore, La.C.Cr.P. art. 905.2 provides that the sentencing hearing is to be conducted according to the rules of evidence. Foster indicated that he could not give an accurate assessment of the cost of sentencing someone to death in Louisiana because no study had been conducted. While Foster did have evidence concerning the costs of executions in other jurisdictions, this material would have no relevance to the costs of an execution in this state. Accordingly, Foster's testimony about these studies was not admissible and was properly excluded by the trial court.
Ultimately, neither the state nor the defense presented any evidence relating to the costs to taxpayers of a death sentence or a sentence of life imprisonment. As a result, defendant suffered no prejudice resulting from the court's ruling.
Defendant also claims that the court "effectively prohibited" him from introducing evidence concerning the infrequency of grants of clemency when it ruled that the prosecution would be allowed to cross-examine Foster on the costs associated with life imprisonment. The record reveals that the state never objected to the admission of testimony pertaining to clemency. Rather, defense counsel tendered the witness before he elicited such testimony. Defendant's claim lacks factual support to demonstrate that the court denied him the opportunity to present evidence on the clemency issue. Thus, this assignment is without merit.

Assignment of Error No. 8
In this assignment of error, defendant claims that the state presented constitutionally insufficient evidence to support the jury's finding of several of the aggravating circumstances at the penalty phase. Specifically, Defendant contends that the evidence did not support four of the five aggravating circumstances relating to the murder of Barnes and three of the five relating to the murder of Anderson.[29]
This court has held on many occasions that the failure of one or more statutory aggravating circumstances does not invalidate others, properly found, unless introduction of evidence in support of the invalid circumstance interjects an arbitrary factor into the proceedings. Wessinger, 98-1234 at p. 38, 736 So.2d at 192; State v. Letulier, 97-1360, p. 25 (La.7/8/98), 750 So.2d 784, 799. Defendant claims that the recent decision in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002) requires this court to revisit this rule.
In Ring, the United States Supreme Court overruled its prior decision in Walton v. Arizona, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), and held that Arizona's capital sentencing scheme, in which the jury found all of the facts necessary *1085 to convict the defendant of first degree murder but the trial court found the aggravating circumstance necessary to punish the defendant with death, as opposed to life imprisonment, violated the Sixth, and by implication the Eighth, Amendment. Ring, 536 U.S. at 589, 122 S.Ct. at 2432. Defendant claims that Ring alters this court's long-standing analysis because this court substitutes its own fact-finding by relying on fewer aggravating circumstances than those found by the jury in affirming the jury's sentence of death.
A court does not substitute its own fact-finding for that of the jury when it invalidates certain aggravating circumstances found by jurors. Rather, the court is performing its appellate duty by reviewing the evidence to ensure that the jury's findings meet the standard set out in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In Zant v. Stephens, 462 U.S. 862, 884, 103 S.Ct. 2733, 2746, 77 L.Ed.2d 235 (1983), the Supreme Court approved of this role when it found that in a state, such as Louisiana, in which a jury is not required to find that the aggravating circumstances outweigh any mitigating factors by a particular evidentiary standard, "a death sentence supported by at least one valid aggravating circumstance need not be set aside ... simply because another aggravating circumstance is invalid in the sense that it is insufficient by itself to support the death penalty." On the other hand, Ring requires that the finding of an aggravating circumstance that supports the imposition of the death penalty be imposed only by a jury. Ring does not speak of the review given by a court to the sufficiency of an aggravating circumstance. Therefore, we find that Ring does not supplant the Supreme Court's decision in Zant.
Of the five aggravating circumstances found by the jury regarding the murder of Anderson, defendant does not complain of two: (1) that the victim was over the age of 65, and (2) that at the time of the commission of the murder defendant was engaged in the perpetration or attempted perpetration of an aggravated burglary. Likewise, defendant does not complain of the jury's finding of an aggravating circumstance based on the fact that Barnes was under the age of twelve. The record shows that at the time of the murders, Anderson was 68 years of age and Barnes was 8 years old. Thus, one factor on each count of murder was supported by the evidence introduced at trial. Accordingly, the jurors most assuredly relied on the victims' age when it found defendant guilty of first degree murder.
Having found one aggravating circumstance was amply supported by the evidence, we consider it unnecessary to inquire whether the jury correctly found that the other aggravating circumstances existed. State v. Roy, 95-0638 (La.10/04/96), 681 So.2d 1230; State v. Knighton, 436 So.2d 1141 (La.1983); State v. Lindsey, 428 So.2d 420 (La.1983); State v. Narcisse, 426 So.2d 118 (La.1983); State v. Moore, 414 So.2d 340 (La.1982); State v. Mattheson, 407 So.2d 1150 (La.1981); State v. Monroe, 397 So.2d 1258 (La.1981); State v. Williams, 383 So.2d 369 (La.1980); State v. Martin, 376 So.2d 300 (La.1979), cert. denied 449 U.S. 998, 101 S.Ct. 540, 66 L.Ed.2d 297 (1980), reh. denied 449 U.S. 1119, 101 S.Ct. 931, 66 L.Ed.2d 847 (1981).
However, the inquiry into the other aggravating circumstances does not end upon the finding of one constitutionally sufficient circumstance because we must review the other circumstances to assure they did not inject any arbitrary factor into the proceeding. Wessinger, 98-1234 at p. 46, 736 So.2d at 196. Even assuming, arguendo, that the other aggravating circumstances about which defendant complains *1086 were improperly submitted to the jury, our review of the record reveals that they did not interject an arbitrary factor into the proceedings because evidence of the manner in which the offense was committed and of the nature of the victims' injuries was relevant and properly admitted at trial. Thus, this assignment of error lacks merit.
As noted throughout this opinion and the appendix, defendant failed to lodge objections at trial to many of the alleged errors of which he now seeks review. Pursuant to the mandate of Wessinger, we reviewed all of the unobjected to alleged errors to insure they did not interject any arbitrary factors into the sentencing proceeding. La. S.Ct.R. 28; State v. Wright, 01-0322, p. 16 (La.12/4/02), 834 So.2d 974, 988. We conclude that none of these alleged errors introduced any arbitrary factor in the jury's deliberations at the penalty phase of the proceedings.

Sentence Review
Under La.C.Cr.P. art. 905.9 and La. S.Ct.R. 28, this court reviews every sentence of death imposed by the courts of this state to determine if it is constitutionally excessive. In making this determination, we consider whether the jury imposed the sentence under influence of passion, prejudice or other arbitrary factors; whether the evidence supports the jury's findings with respect to a statutory aggravating circumstance; and whether the sentence is disproportionate, considering both the offense and the offender. In the instant case, the trial court has submitted a Uniform Capital Sentence Report ("UCSR") and the Department of Public Safety and Corrections ("DOC") has submitted a Capital Sentence Investigation Report ("CSI"). In addition, the defense has filed an opposition to the UCSR.
The UCSR and the CSI both indicate that defendant, Sedwric Emel Clark, is an African-American male and was 29 years old at the time the crimes were committed. He was born in West Carroll Parish to Bennie and Mary Clark. Both of his parents are presently deceased, his father dying in 1991 and his mother dying in 1997. He is one of three children born to the marriage. Defendant graduated from high school in 1988 and completed an auto mechanics program at Lake Providence Vo-tech. The UCSR estimates his intelligence in the medium range (IQ: 70-100). Although defendant has never married, he has fathered three children with three different mothers. One of his daughters, Mariah Barnes, was a victim in the instant case. Defendant has two other daughters: one aged 12, who resides with her mother, and a one-year-old who lives with Malisha Green, defendant's pregnant girlfriend at the time the crimes were committed. Defendant denied any history of substance abuse problems but admitted using alcohol and marijuana shortly before committing the instant offenses.
Defendant has no known juvenile record. In 1990, defendant was convicted in Texas of unauthorized use of a motor vehicle and was placed on five years supervised probation. He abided by the conditions of his probation until the following year when he was arrested in Louisiana for three counts of simple robbery and one count of aggravated battery. The CSI reveals that on August 3, 1991, officers from the Tallulah Police Department responded to a call about gunfire. When they arrived at the scene, a woman reported that an African American male had stopped her vehicle, pulled a pistol and ordered her out of the car. She put her vehicle in reverse and ran into a ditch. When she exited the car, the man shot her in the hip. A description of the assailant ran over the police radio, and defendant was apprehended shortly thereafter. Further investigation revealed that two other individuals had also been *1087 ordered out of their vehicles at gunpoint but had refused and escaped without incident. Defendant was convicted of the crimes and was sentenced to a total of 12 years imprisonment at hard labor. At the time of the murders, defendant had been released from prison and was on parole.
According to his parole officer, defendant maintained steady employment, working at Ruffin Pre-Fab for a short period of time in Oak Grove, Louisiana, and holding a number of other jobs in West Carroll Parish before securing permanent employment with Werner Enterprises driving an 18-wheeler. He was employed by Werner at the time of his arrest.
As part of the CSI, defendant was interviewed at Angola following his convictions. During the interview, defendant contradicted the testimony he gave at the penalty phase in which he admitted committed the crimes and deserved the death penalty. Defendant maintained his innocence and expressed outrage at the conduct of those who participated in his prosecution.[30]

Passion, Prejudice or Other Arbitrary Factors.
The record reveals no indicia of passion, prejudice or arbitrariness. Race was not a factor in the proceedings. Defendant, the victims, and one of the twelve jurors were African-American. Although defendant contends that race was a factor in jury selection, this claim is treated in the appendix to this opinion and is found to be without merit. The UCSR indicates that defendant's case received extensive media coverage. However, as discussed above in defendant's change of venue claim, only four potential jurors out of 124 who were examined about the exposure to pre-trial publicity were excused for that cause. Moreover, defendant's trial took place twenty months after the crime occurred. In addition, as mentioned above, none of the unobjected to alleged errors *1088 argued by defendant interjected any arbitrary factor into the proceedings.

Aggravating Circumstances
At trial, the state argued that five aggravating circumstances existed as to the murder of Anderson: (1) that the offender was engaged in the perpetration or attempted perpetration of an aggravated burglary; (2) that the offender knowingly created a risk of death or great bodily harm to more than one person; (3) that the offense was committed in an especially heinous, atrocious or cruel manner; (4) that the victim was an eye witness to a crime alleged to have been committed by the defendant; and (5) that the victim was sixty-five years of age or older. La. C.Cr.P. art. 905.4(A)(1),(4),(7),(8), (10). The State argued that five aggravating circumstances existed as to the murder of Barnes: (1) that the offender was engaged in the perpetration or attempted perpetration of a second degree kidnapping; (2) that the offender was engaged in the perpetration or attempted perpetration of aggravated rape; (3) that the offender knowingly created a risk of death or great bodily harm to more than one person; (4) that the victim was an eye witness to a crime alleged to have been committed by the defendant; and (5) that the victim was under the age of twelve years. La.C.Cr.P. art. 905.4(A)(1),(4),(8),(10).
The record fully supports a finding that the instant murders were committed against victims that were under the age of twelve and over the age of sixty-five. The record reflects that Barnes was eight at the time of her murder and Anderson was sixty-eight years of age. Even accepting defendant's claims, addressed herein above, that the evidence failed to support any of the other aggravating circumstances, the inclusion of these aggravating circumstances did not interject an arbitrary factor into the proceedings, as evidence of these aggravating circumstances was relevant to the crimes and properly admitted at trial. See Wessinger, 98-1234 at p. 46, 736 So.2d at 196; State v. Roy, 95-0638 at pp. 19-20, 681 So.2d at 1242; State v. Martin, 93-0285, p. 20 (La.10/17/94), 645 So.2d 190, 201.

Proportionality
The federal Constitution does not require a proportionality review. Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). However, comparative proportionality review remains a relevant consideration in determining the issue of excessiveness in Louisiana, State v. Burrell, 561 So.2d 692 (La.1990); State v. Wille, 559 So.2d 1321 (La.1990); Thompson, 516 So.2d 349, though this court has set aside only one death penalty as disproportionately excessive under the post-1976 statutes, finding in that one case, inter alia, a sufficiently "large number of persuasive mitigating factors." State v. Sonnier, 380 So.2d 1, 9 (La.1979); see also State v. Weiland, 505 So.2d 702, 707 (La. 1987) (in case reversed on other grounds, dictum suggested that death penalty disproportionate).
We review death sentences to determine whether the sentence is disproportionate to the penalty imposed in other cases, considering both the offense and the offender. If the jury's recommendation of death is inconsistent with sentences imposed in similar cases in the same jurisdiction, an inference of arbitrariness arises. Sonnier, 380 So.2d at 8.
The state's Sentence Review Memorandum reveals that, since 1976, this is the first death verdict returned by a jury in the Fifth Judicial District, which encompasses West Carroll, Richland and Franklin Parishes. Seventeen other cases originated with first degree murder charges but were resolved without capital punishment. Given the lack of comparable *1089 cases in Richland Parish, it is appropriate for this court to look beyond the judicial district in which the sentence was imposed and to conduct the proportionality review on a state-wide basis. Carmouche, 01-0405, p. 40 (La.5/14/02), ___ So.2d ___, ___; State v. Deal, 00-0434, p. 17 (La.11/28/01), 802 So.2d 1254, 1268; State v. Duncan, 99-2615, p. 38 (La.10/16/01), 802 So.2d 533, 559; State v. Howard, 98-0064, p. 36 (La.4/23/99), 751 So.2d 783, 820; Letulier, 97-1360 at p. 27, 750 So.2d at 800; State v. Thibodeaux, 98-1673, p. 31 (La.9/8/99), 750 So.2d 916, 939; State v. Ortiz, 96-1609, p. 23 (La.10/21/97), 701 So.2d 922, 936; Connolly, 96-1680 at p. 19, 700 So.2d at 823; State v. Davis, 92-1623, p. 35 (La.5/23/94), 637 So.2d 1012, 1031.
A state-wide review reflects that this court has affirmed capital sentences in a variety of cases involving several defendants whose victims were elderly. See State v. Howard, 98-0064, 751 So.2d 783 (defendant and several others savagely beat and stabbed 82-year-old female victim in her home); State v. Robertson, 97-0177 (La.3/4/98), 712 So.2d 8 (defendant savagely stabbed an elderly couple to death during robbery in their home; victims were 76 and 71); State v. Tart, 92-0772 (La.2/9/96), 672 So.2d 116 (La.1996) (defendant bound and repeatedly stabbed elderly couple to death during robbery in their home; victims were 70 and 66); Wingo, 457 So.2d 1159 (defendant and co-defendant escaped from jail, burglarized the home of an elderly couple, shot each victim in the back of the head, and robbed them, taking their car); State v. Glass, 455 So.2d 659 (La. 1984) (same; co-defendant of Wingo); State v. Celestine, 443 So.2d 1091 (La.1983) (defendant strangled an 81-year-old woman in her home during an aggravated rape); Narcisse, 426 So.2d 118 (defendant repeatedly stabbed a 74-year-old woman during an armed robbery in her home). A state-wide review also reflects that this court has affirmed capital sentences in a variety of cases involving defendants whose victims were under the age of twelve. Carmouche, 01-0405, ___ So.2d ___ (defendant shot three victims with a shotgun, including his two-year-old daughter); Deal, 00-0434, 802 So.2d 1254 (defendant killed two-month-old son by throwing him into baby crib); State v. Smith, 98-1417 (La.6/29/01), 793 So.2d 1199 (defendant and two others during the course of an attempted armed robbery or aggravated burglary killed three people, including a three-year-old); State v. Langley, 95-1489 (La.4/14/98), 711 So.2d 651, conviction vacated on other grounds, 95-1489 (La.4/3/02), 813 So.2d 356(finding prima facie case of discrimination in selection of jury foreperson); Connolly, 96-1680, 700 So.2d 810 (defendant killed nine-year-old boy during the course of an aggravated rape); State v. Sepulvado, 93-2692 (La.4/8/96), 672 So.2d 158 (defendant hit six-year-old stepson over the head with a screwdriver then submerged him in a bathtub of scalding water); Wille, 559 So.2d 1321 (defendant killed eight-year-old female after committing after raping her along with another male); State v. Loyd, 489 So.2d 898 (La.1986) (defendant drowned three-year-old girl after raping her); State v. Brogdon, 457 So.2d 616 (La. 1984) (defendant beat with a brick and killed eleven-year-old girl after raping her with another male). Compared with these cases, we conclude that the sentence of death in this case was not disproportionate.

DECREE
For the reasons assigned herein, defendant's convictions for first-degree murder and his sentences of death are affirmed. In the event this judgment becomes final on direct review when either: (1) the defendant fails to petition timely the United States Supreme Court for certiorari; or (2) that Court denies his petition for certiorari; *1090 and either (a) the defendant, having filed for and been denied certiorari, fails to petition the United States Supreme Court timely, under its prevailing rules for rehearing of denial of certiorari, or (b) that Court denies his petition for rehearing, the trial judge shall, upon receiving notice from this court under La. C.Cr.P. art. 923 of finality of direct appeal, and before signing the warrant of execution, as provided by La. R.S. 15:567(B), immediately notify the Louisiana Indigent Defense Assistance Board and provide the Board with reasonable time in which: (1) to enroll counsel to represent the defendant in any state post-conviction proceedings, if appropriate, pursuant to its authority under La. R.S. 15:149.1; and (2) to litigate expeditiously the claims raised in that original application, if filed, in the state courts.
AFFIRMED.
NOTES
[1] Agent Holmes testified that he did not know whether Barnes's body had been located even though he had talked to the Louisiana authorities throughout the day to relay information defendant was giving him.
[2] PSA is an acronym for prostate specific antigen, and as Gains testified, is a substance she looked for to determine the presence of seminal fluid or male urine. She noted that PSA is commonly found in pre-ejaculate fluid, semen, a male's urine, and blood. She also stated that recent studies have indicated that females carry small amounts of PSA.
[3] The jury found that the following aggravating circumstances applied to the murder of Bertha Lee Anderson: (1) the offender knowingly created a risk of death or great bodily harm to more than one person; (2) the victim was over the age of 65; (3) the offense was committed in an especially heinous, atrocious or cruel manner; (4) at the time of the commission of the offense, the offender was engaged in the perpetration or attempted perpetration of an aggravated burglary; and (5) the victim was eyewitness to a crime.

Regarding the murder of Mariah Barnes, the jury found the aggravating circumstances that: (1) the offender knowingly created a risk of death or great bodily harm to more than one person; (2) the victim was under the age of 12; (3) the offense was committed in an especially heinous, atrocious or cruel manner; (4) at the time of the commission of the offense, the offender was engaged in the perpetration or attempted perpetration of an aggravated rape or second degree kidnapping; and (5) the victim was an eyewitness to a crime.
[4] The assignments of error not discussed in this opinion do not constitute reversible error and are governed by well-settled principles of law. Those assignments are reviewed in an unpublished appendix that will comprise a part of the official record in this case.
[5] In denying the writ application, the Second Circuit stated:

At this juncture in the proceedings, applicant has neither met his burden of proving he will be unable to obtain a fair and impartial jury nor has he affirmatively shown error and an abuse of discretion in the trial court's ruling which transferred venue from West Carroll Parish to Richland Parish. (citations omitted).
[6] Louisiana courts also recognize that in unusual circumstances prejudice against the defendant may be presumed. Frank, 99-0553 at p. 13 n. 7, 803 So.2d at 14 n. 7; State v. Brumfield, 96-2667 (La. 10/20/98), 737 So.2d 660, 677; State v. David, 425 So.2d 1241, 1246 (La. 1983).
[7] For examples of other cases relying on this method of analyzing the question of possible community prejudice, see Frank, 99-0553 at pp. 16-18, 803 So.2d at 16-17 (110 out of 113 venire members "had been exposed to some publicity surrounding the case" and 89% of the prospective jurors indicated that they had been exposed to information about the case on more than one occasion or from multiple sources); State v. Connolly, 96-1680, p. 5 (La.7/1/97), 700 So.2d 810, 815 (although 86.33%, 120 out of 139, potential jurors possessed some knowledge about the crime, most had only a vague recollection of the surrounding facts); State v. Wilson, 467 So.2d 503, 513 (La. 1985) ("Although a majority of prospective jurors (i.e., 24 of 39) admitted exposure to pre-trial publicity, only four were excused for cause on ground of their formation of a fixed opinion.... A review of the responses by potential jurors on voir dire does not reveal the existence of collective community prejudice which could have denied defendant a fair trial before impartial jurors."); State v. Clark, 442 So.2d 1129, 1133 (La.1983) (motion for change of venue granted based on dry run voir dire in which 37 of 38 jurors recalled details of crime and only six out of 24 jurors in the last two groups questioned indicated that their knowledge would not affect their decision); David, 425 So.2d at 1247 (out of 112 jurors, 27 had read or heard about the case, but only six of those 27 had an opinion, and all four of those jurors who said that they could not put their opinion aside were excused for cause); State v. Rodrigue, 409 So.2d 556, 559 (La.1982) (in a mock voir dire set up in order to determine the impact of media coverage by the court, 26 of 30 prospective jurors had read about the case, but only nine had fixed an opinion which satisfied the court that a jury could be chosen in that parish).
[8] Responses on the jury questionnaires revealed that 101 out of 115 venire members who provided some information of the matter on their responses indicated that they read the Monroe News-Star. Five of the articles in this publication appeared on the front page while the remaining one began on page three.
[9] The record shows that not all members of the venire were questioned about exposure to the case. In fact, only one juror of the first panel potential jurors was indirectly questioned on her exposure to publicity of the case.
[10] Seven prospective jurors were challenged for cause based on their inability to set aside their pre-conceived opinion about defendant's guilt. The court granted the challenges to four of these jurors, two of whom were married and the sister- and brother-in-law to West Carroll Parish Sheriff's Office Chief Deputy Louis Russell, a witness in the case.
[11] His comments appear in the Monroe News Star on February 15, 16, 17, and 18, 2002, and in the Richland Beacon News on February 17,2000.
[12] Notably, the record shows that defense counsel objected to the imposition of the gag order.
[13] The court stated:

We want jurors who will be able to treat both sides fairly and who will make their decisions based solely on what they hear and see in the courtroom and not upon what they heard, read, or saw outside of the courtroom. Therefore, if something about this case is printed in a newspaper, then do not read it. If something is said about this case on TV or on the radio, do not watch or listen to the broadcast. If someone tries to talk to you about this case, then let them know that you have strict orders from the [c]ourt not to receive any information about this case.
[14] In his closing argument, the district attorney stated:

What has happened during the last three or four days, is a story so gross and so horrible that I defy you to think about any crime spree in our small community or area that compares to this tragic brutality and violence that brought the death[s] of Bertha Anderson and Mariah Barnes.
[15] According to the U.S. Census Bureau, the population of the parish was estimated in 2001 at 20,930. See U.S. Census Bureau, State and Country Quickfacts, Richland Parish, Louisiana available at http://quickfacts. census.gov/ qfd/states/22/ 22083.html (last visited June 27, 2003).
[16] Namely, two venire members were related by marriage to a West Carroll deputy who was a witness at trial; one venirewoman's brother was Barnes's principal at school and knew Anderson; one venireman worked in West Carroll Parish with co-workers who lived next to decedents; a venirewoman worked in West Carroll.
[17] Defendant refers to the following incidents: (1) an "angry mob" attempting to extract defendant from a police cruiser outside the Anderson residence; (2) a statement by a correctional officer indicating concern about protecting defendant from the victims' family and defendant's subsequent transfer to a different jail; (3) disruptions in the courtroom caused by members of the victims' family; and (4) references by the prosecution to the desire of the victims' families to avenge their murders.
[18] Thirty-seven members of the venire admitted to some relationship with the police or the district attorneys' offices. Twenty-four prospective jurors stated that they knew either one or both of the attorneys prosecuting the case. Four other potential jurors were relatives or knew members of other Richland Parish law enforcement agencies.
[19] Katharine Darnell, Deputy Russell's sister-in-law, testified that she could listen independently to all of the evidence. Although the trial court indicated it believed her, it determined her relationship nonetheless could influence her decision and excused her for cause.
[20] The record shows that Claire Douciere, Michael Fife, and John Williams were excused based on their relationships before being questioned by the prosecution or the defense. Charles Darnell, Deputy Russell's brother-in-law, was excused shortly after the commencement of questioning but was not questioned whether he could impartially consider the evidence.
[21] Defendant refers to an event that occurred while defendant was traveling back to the West Carroll jail from a pre-trial motion hearing in Rayville. This evidence was not made part of the trial record below, and we denied his motion to supplement the record on appeal with this evidence. Consequently, we will not consider this alleged incident.
[22] The letter additionally states the move was requested for a second reason, that defendant had returned from the hospital after having his left wrist cut in two places and each ankle cut to a lessor degree. Defense counsel introduced the letter during the sentencing phase to assert that defendant had attempted suicide.
[23] The trial court made the following observations in his ruling:

This was my assessment of what happened. The first lady to get up and leave the courtroom was seated to my left and I did not hear anybody crying. I just saw the lady get up and she maneuvered around, I think the back of the courtroom and left .... very respectfully, very gracefully, and very quietly. Then I noticed someone else get up on my right. By the same token, she did not [t]here was no outburst. There was no crying. She simply left the courtroom. Now apparently was this lady that just testified. Just a few minutes after that, I noticed a young lady, it looked like she slumped over and was resting on someone's shoulder and they put herkind of laid her down a little bit and then began to pick her up. When I noticed that someone was picking her up, then I instructed the jury to remove themselves from the courtroom. And by that time they had gotten her, I think in the aisle and were attempting to lift her out of the courtroom. I did not know who the lady was. But there was never any crying out. There were never any outburst[s] that I heard. And everything was done in a very respectful manner. There was some small commotion when they were attempting to lift this lady who had passed out or who had fainted. But it was not a huge commotion. It was not a huge commotion at all. In fact, I did not hear anyone talking. It was more scuffling of feet than anything else. So that is my assessment of what happened.
[24] The trial court made the following instruction:

I need to instruct you that you are to base your decision in this case solely on the evidence that's presented from this witness stand and the other items of evidence that you have been given permission to look at or to listen to. You're not to base your decision on anything else that happens. Anything that happens out in the audience, anything else. You're to base your decision on the evidence that's presented by the attorneys and also apply the law that I give you at the close of the case to that evidence in reaching your decision. You're not to let anything else that happens in this courtroom have any impact whatsoever on your decision making process.
[25] Courts have traditionally upheld denials of motions for mistrial based on emotional outbursts when a defendant fails to show their influence upon the jury prejudiced his right to a fair trial. See State v. Domangue, 350 So.2d 599, 602 (La. 1977) (mistrial unnecessary when rape victim's spouse cried during closing before going outside); State v. Hopkins, 626 So.2d 820, 822-23 (La.App. 2 Cir.1993) (mistrial not warranted when victim's family cried during closing arguments, at least when judge later charged the jury not to be influenced by sympathy, passions, prejudice or public opinion); State v. Worthen, 550 So.2d 399, 401 (La.App. 3 Cir.1989) (unprovoked verbal outburst and crying by the victim under cross-examination did not warrant mistrial, at least after judge strongly admonished the jurors that outburst not appropriate and should not influence them); State v. Wright, 441 So.2d 1301, 1306 (La.App. 1 Cir.1983) (mistrial unnecessary when spectator who had "beg[u]n crying [and] creating a scene" left promptly and judge admonished jury).
[26] La.C.Cr. P. 557 provides, in pertinent part:

A court shall not receive an unqualified plea of guilty in a capital case. However, with the consent of the court and the state, a defendant may plead guilty with the stipulation either that the court shall impose a sentence of life imprisonment without benefit of probation, parole, or suspension of sentence without conducting a sentencing hearing, or that the court shall impanel a jury for the purpose of conducting a hearing to determine the issue of penalty in accordance with the applicable provisions of this Code.
[27] Defendant's confession was introduced into evidence, in which he asserted that he had smoked marijuana and drunk alcohol before he committed the murders. Voluntary consumption of marijuana and alcohol could not, however, as a matter of law, support a finding that he did not know right from wrong at the time of the crime and that he had therefore been legally insane. See State v. Scott, 344 So.2d 1002, 1005 (La.1977)
[28] Professor Foster stated:

Sedwric would be held in a single person's cell on one of the tiers on death row. Which is a separate building near the front gate of the prison. He would be held in isolation without any kind of work assignment or participation in any other organized inmate activities. He would kept (sic) under a very high degree of security. He would be allowed out of his cell an hour a day for exerciseGet to go outside three times a week. He would be allowed to consult with his attorney or anyone else who might come to him on a legal visit. He would be allowed to have contact with a spiritual adviser. He would not be allowed to have contact visits with his family members at present because those [ ] have been restricted after an attempted escape at death row several years ago. He would remain in a state of suspended animation for several years until the appeal process is completed and a date is set for his execution. And then he would be taken to Camp F, where lethal injections are done and placed in a holding cell for that day, the last day. Would be allowed to meet with any family members or friends or supporters, his spiritual advisers, his attorneys, any others who might be there at some time between the hours of six and nine on some evening in the future. He would be escorted down the hall from the holding cell into a lethal injection chamber and placed on a table. And IV's (sic) inserted in both arms and he would be put to death through lethal injection.
[29] Defendant contends that the evidence was insufficient to show the following aggravating circumstances as to Anderson: (1) that the offender knowingly created a risk of death or great bodily harm to more than one person; (2) that the murder was committed in an especially heinous, atrocious or cruel manner; and (3) that the victim was an eyewitness to a crime; and the following as to Barnes: (1) that the offender knowingly created a risk of death or great bodily harm to more than one person; (2) that the murder was committed in an especially heinous, atrocious or cruel manner; (3) that the victim was an eyewitness to a crime; and (4) that at the time of the commission of the offenses, the offender was engaged in the perpetration or attempted perpetration of aggravated rape and second degree kidnapping.
[30] Defendant gave the following statement:

I am very angry and if I was out I would kill Judge McIntyre, Mr. Stephens, all the district attorneys because they allowed people to get on the stand and frame, lie on me and kill me with their lies and destroyed my family. The court should have done what is right and should have gotten accurate evidence and I also wish that I should have followed my first plan to kill Sheriff Gary Bennett. Therefore, this time I will follow through on my plan. My two uncles are very very upset because Sheriff Bennett knew that he allowed injustice to fall. West Carroll Sheriff's Office used illegal means to gather their evidence and all of their evidence is inaccurate. Also, the West Carroll Parish Sheriff's Department used Richland Parish and its Sheriff's Department for its dirty purpose of condemning me to death.
I am not an evil person. I could not have killed two people, one of which is my very own daughter, my own flesh and blood, however, I have turned evil now because of what happened. The West Carroll Sheriff's Office used evil to destroy me, so now I am evil and will return their own evil to them pretty soon.
There were other people that could have been used to testify as truthful witnesses. One main witness was not even called to the stand and his name is Deputy Bob Epting and he was right there on the spot when the victims' family jumped on me and beat me. That is how those scratches got on my face and the West Carroll Sheriff's Department knew this, so that's why he, Bob Epting, was not called to the stand. Chief Deputy Russell of the West Carroll Sheriff's Department stated on the stand that he noticed my hands were swollen when I was first brought in for questioning. Now, if that were true, then why would he have released me from custody if my hands were like that. He lied to the jurors just to get a conviction. These are just a few facts to tell the court how I was tried unfairly and also the reason why I have now evil and bad blood in my heart and not just me, but also my children and family; because my family knows the truth. I think that Richland Parish should really be praying because they done let a bad bad thing happen. And because of West Carroll's failure to do justice and let me mention that there is still probably a killer among you.