# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

### 23-18 consolidated with 23-19

**STATE OF LOUISIANA**

**VERSUS**

**MARVIN WATSON**

**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
SEVENTH JUDICIAL DISTRICT COURT
PARISH OF CONCORDIA, NO. 19-2158 & 19-2159 Div. "B"
HONORABLE JOHN C. REEVES, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

**SHARON DARVILLE WILSON
JUDGE**

**\*\*\*\*\*\*\*\*\*\***

Court composed of Shannon J. Gremillion, Van H. Kyzar, and Sharon Darville Wilson, Judges.

**AFFIRMED.**

**Hon. Bradley R. Burget, District Attorney**
**Joseph Anthony Boothe, Assistant District Attorney**
**Seventh Judicial District Court – Concordia Parish**
**4001 Carter Street, Suite #9**
**Vidalia, LA 71373**
**(318) 336-5526**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**

**Prentice Lang White**
**Louisiana Appellate Project**
**P. O. Box 74385**
**Baton Rouge, LA 70874**
**(225) 235-2928**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Marvin Watson**

**Marvin Watson**
**Louisiana State Penitentiary**
**17544 Tunica Trace**
**Angola, La 70712**
**DEFENDANT/APPELLANT:**
    **Marvin Watson**

**WILSON, Judge.**

In these consolidated cases, a jury found Defendant, Marvin Watson, guilty of two counts of first-degree murder, a violation of La.R.S. 14:30. Mr. Watson filed a pro se Motion for New Trial wherein he alleged there was purposeful discrimination in the selection of the jury. The motion was heard and denied. Mr. Watson waived the sentencing delays and was sentenced to two consecutive terms of life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence. Mr. Watson now appeals the judgment of the trial court. For the following reasons, we affirm the convictions and sentences.

I.

**ISSUES**

We must decide:

(1)  whether the state presented evidence sufficient to establish that the shootings were not in self-defense; and

(2)  whether the trial court erred in denying Mr. Watson's pretrial motion for change of venue.

II.

**FACTS AND PROCEDURAL HISTORY**

At 12:33 a.m. on July 30, 2019, officers from the Concordia Parish Sheriff's Office were dispatched to 211 Anderson Road in Clayton, Louisiana, to respond to a 911 call made by DeMarcus McCoy. DeMarcus told the 911 operator that he had arrived home to find his mother, Megan McCoy Watson, and his twelve-year-old brother, LaFrederick McCoy, unresponsive. He further advised that Mr. Watson, Megan's husband, was not home. Upon their arrival, officers found the victims lying dead on the kitchen floor. Based on the amount of blood and apparent

gunshot wounds, it appeared the victims had been shot to death. Officers were informed that at approximately 12:55 a.m., Mr. Watson surrendered himself to the Adams County Sheriff's Office in Natchez, Mississippi, where he also surrendered two firearms: and American Tactical rifle ("AR-15") and a Ruger .22 pistol (pistol). Mr. Watson was later charged with one count of first-degree murder of LaFrederick under trial court docket number 19-2158, and an additional count of first-degree murder of Megan under trial court docket number 19-2159. On February 12, 2020, defense counsel filed a Motion to Recuse the district attorney's office, arguing the district attorney could not be fair and impartial because an investigator in their office was related to the victims. The trial court denied the motion on March 10, 2020. Mr. Watson filed a pro se Motion to Recuse the district attorney's office on September 28, 2020, and a pro se Motion to Recuse the trial judge on October 9, 2020. Both motions were denied.

On April 12, 2021, the State consolidated the charges for trial, and jury selection commenced. Following a four-day trial, the jury unanimously found Mr. Watson guilty as charged on both counts. On April 19, 2021, Mr. Watson filed a pro se Motion for New Trial wherein he alleged there was purposeful discrimination in the selection of the jury in his case. On April 28, 2021, the trial court held a hearing on the motion. After the trial court denied the motion, Mr. Watson waived the sentencing delays and was sentenced to two consecutive terms of life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence. Mr. Watson is now before this court asserting two assignments of error.

### III.

## LAW AND DISCUSSION

## ERRORS PATENT

2

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find there are no errors patent, but the minutes of sentencing need correction. Although the transcript indicates that the trial court ordered the two life sentences to be served consecutively, the minutes fail to state such. "[I]t is well settled that when the minutes and the transcript conflict, the transcript prevails." *State v. Wommack*, 00-137, p. 4 (La.App. 3 Cir. 6/7/00), 770 So.2d 365, 369, *writ denied*, 00-2051 (La. 9/21/01), 797 So.2d 62. Accordingly, we instruct the trial court to amend the court minutes to correctly reflect that the trial court ordered the two life sentences to be served consecutively.

## SUFFICIENCY OF THE EVIDENCE

In his first assignment of error, Mr. Watson alleges the evidence was insufficient to support his first-degree murder convictions.

The general analysis for insufficiency of the evidence claims is well-established:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (citing *State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

Moreover, when reviewing cases relying on circumstantial evidence, this court has stated the following:

> When the conviction is based upon circumstantial evidence, La.R.S. 15:438 provides that the state "must exclude every reasonable hypothesis of innocence" in order to convict. *State v. Camp*, 446 So.2d 1207, 1209 (La.1984). "Circumstantial evidence consists of proof of collateral facts and circumstances from which elemental factors may be inferred according to reason, experience and common sense." *State v. Burns*, 441 So.2d 843, 845 (La.App. 3 Cir.1983). However, La.R.S. 15:438 does not establish a stricter standard of review on appeal than the rational juror's reasonable doubt standard. The statute serves as a guide for the jury when considering circumstantial evidence. On appeal, the issue is whether a rational trier of fact, when viewing the evidence in a light most favorable to the prosecution, could find that all reasonable hypotheses of innocence were excluded. *State v. Williams*, 13-497 (La.App. 3 Cir. 11/6/13), 124 So.3d 1236, *writ denied*, 13-2774 (La. 5/16/14), 139 So.3d 1024.

*State v. Baumberger*, 15-1056, pp. 10–11 (La.App. 3 Cir. 6/1/16), 200 So.3d 817, 826-27, *writ denied*, 16-1251 (La. 5/26/17), 221 So.3d 859, *cert. denied*, ___ U.S. ___, 138 S.Ct. 392 (2017).

Mr. Watson does not contest that he shot and killed his wife and stepson; rather, he argues that the State failed to disprove beyond a reasonable doubt that the homicides were committed in self-defense. Louisiana Revised Statutes 14:30(A)(3) defines first degree murder as "[t]he killing of a human being . . . [w]hen the offender has a specific intent to kill or to inflict great bodily harm upon more than one person." "Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La.R.S. 14:10(1). "Specific intent may be inferred from the circumstances surrounding the offense and the conduct of

4

the defendant." *State v. Draughn*, 05-1825, pp. 7-8 (La. 1/17/07), 950 So.2d 583, 592-93 (citations omitted), *cert. denied*, 552 U.S. 1012, 128 S.Ct. 537 (2007).

Louisiana Revised Statutes 14:20 provides, in pertinent part:

> A. A homicide is justifiable:
>
> (1) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.
>
> (2) When committed for the purpose of preventing a violent or forcible felony involving danger to life or of great bodily harm by one who reasonably believes that such an offense is about to be committed and that such action is necessary for its prevention. The circumstances must be sufficient to excite the fear of a reasonable person that there would be serious danger to his own life or person if he attempted to prevent the felony without the killing.
>
> . . . .
>
> C. A person who is not engaged in unlawful activity and who is in a place where he or she has a right to be shall have no duty to retreat before using deadly force as provided for in this Section, and may stand his or her ground and meet force with force.
>
> D. No finder of fact shall be permitted to consider the possibility of retreat as a factor in determining whether or not the person who used deadly force had a reasonable belief that deadly force was reasonable and apparently necessary to prevent a violent or forcible felony involving life or great bodily harm or to prevent the unlawful entry.

The State has the affirmative burden of proving beyond a reasonable doubt that the homicide was not perpetrated in self-defense. *State v. Lynch*, 436 So.2d 567 (La.1983); *State v. Paddio*, 02-722 (La.App. 3 Cir. 12/11/02), 832 So.2d 1120, *writ denied*, 03-402 (La. 2/13/04), 867 So.2d 682. In discussing the factors to be considered in examining a self-defense claim, this court has stated:

> "In examining a self-defense claim, it is necessary to consider: (1) whether the defendant reasonably believed that he was in imminent danger of death or great bodily harm; (2) whether the killing was necessary to prevent that

5

death or great bodily harm; and (3) whether the defendant was the aggressor in the conflict." *State v. Mayes*, 14-683, pp. 2-3 (La.App. 3 Cir. 12/23/14), 154 So.3d 1257, 1259, *writs denied*, 15-178, 15-220 (La.11/16/15), 184 So.3d 24. Additionally, in determining whether the defendant had a reasonable belief that the killing was necessary, it is appropriate to consider "the excitement and confusion of the situation, the possibility of using force or violence short of killing, and the defendant's knowledge of the assailant's bad character." *State v. Thomas*, 43,100, p. 5 (La.App. 2 Cir. 4/30/08), 981 So.2d 850, 854, *writ denied*, 08-1276 (La.2/6/09), 999 So.2d 769.

*State v. Fox*, 15-692, p. 4 (La.App. 3 Cir. 2/3/16), 184 So.3d 886, 890, *writ denied*, 16-404 (La. 3/13/17), 216 So.3d 800.

In the present case, the jury was presented with two versions of what occurred on the day of the homicides. Through his own testimony at trial, Mr. Watson's version of events indicated that Megan and LaFrederick attacked him after he confronted Megan and stated his intention of leaving her. Mr. Watson testified that LaFrederick attempted to shoot him with the AR-15, but he was able to wrestle the gun away after it misfired. According to Mr. Watson, he was fleeing the house, with Megan and LaFrederick in pursuit, when he tripped and accidentally fired multiple times, killing Megan and wounding LaFrederick. Mr. Watson claimed he followed LaFrederick to the bathroom to retrieve the pistol from him and get him medical help, but, after hearing a loud noise, he again fell backwards and shot multiple times, killing LaFrederick. A few minutes later, he opened the bathroom door, saw LaFrederick dead, and picked up the pistol which he alleged fell in the sink. He then got in his car and left for Natchez, but his eye was bleeding and he had double vision. After consulting with a lawyer, he turned himself into the police.

The State's version, on the other hand, was that Mr. Watson entered the residence while Megan and LaFrederick were in the kitchen and opened fire. The State argued that after Megan was killed, LaFrederick sustained the graze wound to

6

his face. LaFrederick then ran to the bathroom to escape, and Mr. Watson chased after him, punched a hole in the bathroom door, and fired the AR-15 into the bathroom where LaFrederick was hiding. After considering the physical evidence and the witnesses' testimony, the jury concluded the homicides were not committed in self-defense and found the State's evidence supported convictions for first degree murder.

After reviewing the record, we find that the evidence overwhelmingly shows that Mr. Watson did not kill Megan and LaFrederick in self-defense. According to Mr. Watson's trial testimony, Megan and LaFrederick were the aggressors who beat him and attempted to shoot him in the back. Both Megan and LaFrederick were taller and heavier than Mr. Watson, and he argues that he was acting with a motivation to preserve his life when he armed himself and shot. The only evidence in the record that suggests the killings were done in self-defense is the self-serving testimony of Mr. Watson. However, Mr. Watson's testimony was confusing and full of inconsistencies. Moreover, his version of the facts is incompatible with the physical evidence presented in the case.

Mr. Watson alleged that a struggle took place. The crime scene did not show any signs that a violent physical confrontation had occurred. Mr. Watson did not have any visible signs of recent injury other than the superficial cut above his eye, and the clothes he was wearing were not torn. Lieutenant Chris Groh testified that he interviewed Mr. Watson and observed dried blood on his left eyebrow, but the injury was not severe. Similarly, the autopsies revealed that neither Megan nor LaFrederick had non-gunshot injuries to their bodies or defensive wounds on their hands to indicate there was a physical altercation. The testimony of Dr. Tape, who performed the autopsies on the victims, establishes that the fatal gunshot wounds to both Megan and LaFrederick were inflicted at a downward angle which does not

comport with his allegation that the shots were fired while falling to the ground. Further, one gunshot wound was inflicted on LaFrederick while he was sitting or bending over behind the bathroom door.

The physical evidence is particularly compelling in the killing of LaFrederick. Mr. Watson stated that he was armed with the AR-15 when LaFrederick ran away from him into the master bathroom. Mr. Watson then claims he followed LaFrederick because he had a pistol in the bathroom with him and he wanted to retrieve it. It is inconceivable that Mr. Watson was in fear of his life when he followed the child into another room and shot him through a closed door. While Mr. Watson claimed this shooting resulted from him accidentally firing after hearing a gunshot, the evidence directly contradicts this. No spent casings were found from the pistol and there were no bullet holes in the door. There was however a hole punched through the bottom half of the door. The evidence supports the notion that Mr. Watson punched a hole in the door and stuck the gun through it before intentionally firing at the boy who was crouching down behind it.

Despite Mr. Watson's self-serving testimony, there was no evidence that the either of the victims was armed, and all the shell casings recovered were from the AR-15 wielded by Mr. Watson. Even if either had a gun, the fact that Mr. Watson fired the AR-15 six times—one bullet instantly killing Megan and three bullets striking and killing LaFrederick—contradict the theory of reasonable necessity. The number of gunshot wounds inflicted, combined with the lack of any significant wounds to Defendant, further discredits his claim of self-defense and supports the State's evidence that Mr. Watson had the requisite specific intent to kill the victims.

The State also introduced evidence of Mr. Watson's prior conviction in which he pled guilty to manslaughter for killing Peter Jones. When the State asked

8

Mr. Watson if he had ever threatened anyone else with a gun, he said he had not. However, Mr. Watson's credibility was undermined when DeMarcus testified that Mr. Watson had pointed a gun at his head and threatened him because DeMarcus put his feet on a coffee table. Moreover, Mr. Watson's actions in failing to immediately report the shootings and leaving the scene after shooting the victims are not consistent with his claim that he acted in self-defense. Flight following an offense, as well as concealment, and attempt to avoid apprehension indicate "consciousness of guilt and, therefore, [are] circumstances from which the jury may infer guilt." *State v. Davies*, 350 So.2d 586, 588 (La.1977). The jury heard testimony from Mr. Watson indicating that he immediately left Louisiana following the shootings and the first thing that came to his mind was getting a lawyer, not seeking emergency assistance. Even though he later turned himself in to the Mississippi police, he refused extradition back to Louisiana.

The evidence presented, viewed in the light most favorable to the prosecution, proved beyond a reasonable doubt and to the exclusion of every reasonable hypothesis of innocence, all of the elements of first-degree murder. As a trier of fact, a jury is free to accept or reject, in whole or in part, the testimony of any witness. *State v. Dorsey*, 10-216 (La. 9/7/11), 74 So.3d 603. In this case, the jury clearly chose to believe the evidence and testimony that contradicted Mr. Watson's claim of self-defense. Given the evidence discussed above, the jury's credibility findings were not clearly contrary to the evidence. Accordingly, the evidence was sufficient to support Mr. Watson's first-degree murder convictions. This assignment of error is without merit.

9

## CHANGE OF VENUE

In his second assignment of error, Mr. Watson asserts the trial court erred in denying his pretrial motion for change of venue wherein he argued that he could not obtain a fair and impartial trial because of prejudice that existed in the public mind. Every defendant has the right to an impartial jury and a fair trial. La.Const. art. I, § 16; *State v. Bell*, 315 So.2d 307 (La.1975). The law provides for a change of venue should a defendant establish that he will be unable to obtain such an impartial jury or a fair trial at the place of original venue. *State v. Brown*, 18-1999 (La. 9/30/21), 330 So.3d 199, *cert. denied*, ___ U.S. ___, 142 S.Ct. 1702 (2022).

Louisiana Code of Criminal Procedure Article 622 provides the grounds for a change of venue as follows:

> A change of venue shall be granted when the applicant proves that by reason of prejudice existing in the public mind or because of undue influence, or that for any other reason, a fair and impartial trial cannot be obtained in the parish where the prosecution is pending.
>
> In deciding whether to grant a change of venue the court shall consider whether the prejudice, the influence, or the other reasons are such that they will affect the answers of jurors on the voir dire examination or the testimony of witnesses at the trial.

Only in rare cases will prejudice against a defendant be presumed. *See State v. David*, 425 So.2d 1241, 1246 (La.1983) ("[U]nfairness of a constitutional magnitude will be presumed in the presence of a trial atmosphere which is utterly corrupted by press coverage or which is entirely lacking in the solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the verdict of the mob."). In all other cases, a defendant has the burden of showing actual prejudice. *See State v. Magee*, 11-574 (La. 9/28/12), 103 So.3d 285, *cert. denied*, 571 U.S. 830, 134 S.Ct. 56 (2013).

The Louisiana Supreme Court has set forth the criteria that must be met

for a defendant to meet his burden of proving actual prejudice as follows:

> To meet this burden, a defendant must prove more than mere public knowledge or familiarity with the facts of the case: he must demonstrate the extent of prejudice in the minds of the community as a result of such knowledge or exposure to the case. *State v. Clark,* 02–1463, p. 18 (La.6/27/03), 851 So.2d 1055, 1071; *State v. Frank,* 99–0553, p. 14 (La.1/17/01), 803 So.2d 1, 15. A defendant is not entitled to a jury entirely ignorant of his case and cannot prevail on a motion for change of venue simply by showing a general level of public awareness about the crime; rather, he must show that there exists such prejudice in the collective mind of the community that a fair trial is impossible. *Clark,* 02–1463 at 17, 18, 851 So.2d at 1070, 1071. Whether a defendant has made the requisite showing of actual prejudice is a question addressed to the district court's sound discretion which will not be disturbed on appeal absent an affirmative showing of error and abuse of discretion. *Sparks,* 88–0017 at 16–17, 68 So.3d at 457; *Lee,* 05–2098 at 33, 976 So.2d at 133; *Clark,* 02–1463 at 17, 851 So.2d at 1071.
>
> In *Bell,* [315 So.2d 307 (La.1975)], this court enumerated several factors relevant to the district court's determination of whether to order a change of venue. These factors include: (1) the nature of pretrial publicity and the degree to which it has circulated in the community; (2) the connection of government officials with the release of the publicity; (3) the length of time between the dissemination of the publicity and the trial; (4) the severity and notoriety of the offense; (5) the area from which the jury is to be drawn; (6) other events occurring in the community which either affect or reflect the attitude of the community or individual jurors toward the defendant; and (7) any factors likely to affect the candor and veracity of the prospective jurors on voir dire. *Bell,* 315 So.2d at 311. In setting out these factors, this court emphasized that in deciding whether to change venue, the district court must extend its focus beyond the prejudices and attitudes of individual venire persons. The defendant must be allowed to show that, even if it would be possible to select a jury whose members were not subject to a challenge for cause, prejudice or influences exist within the community at large that would affect the juror's answers during voir dire or the witnesses' testimony, or that for any other reason, a fair and impartial trial could not be obtained in that venue. *Clark,* 02–1463 at 16–17, 851 So.2d at 1070; *Bell,* 315 So.2d at 313. The district court's ultimate determination

> must rest on the community's attitude toward the defendant. *Clark,* 02–1463 at 17, 851 So.2d at 1075.
>
> In reviewing a denial of change in venue, the primary task of the court is to inquire as to the nature and scope of publicity to which prospective jurors in a community have been exposed and examine the lengths to which a court must go to impanel a jury that appears to be impartial in order to ascertain whether prejudice existed in the minds of the public which prevented the defendant from receiving a fair trial. *Clark,* 02–1463 at 18, 851 So.2d at 1071. In performing this review, courts must distinguish largely factual publicity from that which is invidious or inflammatory, as the two present real differences in the potential for prejudice. *Id.* While, ultimately, there is no bright line test for ascertaining the degree of prejudice existing in the collective mind of the community, the seven *Bell* factors help facilitate the inquiry. *Sparks*, 88–0017 at 18, 68 So.3d at 457; *Frank,* 99–0553 at 16, 803 So.2d at 16. In addition, courts have examined the number of jurors excused for cause for having a fixed opinion as another gauge of whether prejudice exists in the public mind. *Clark,* 02–1463 at 18, 851 So.2d at 1071; *Frank,* 99–0553 at 15, 803 So.2d at 15.

*Id.* at 298-99.

In an effort to prove actual prejudice, the defense introduced several articles from Mississippi newspapers which were published in late June and early July of 2019. One paper reported that the Concordia Parish Sheriff's Office was seeking extradition of Mr. Watson, "a man they believe killed two people in Clayton this weekend." According to Sheriff Hedrick, Mr. Watson, accompanied by his attorney, surrendered himself to the Adams County Sheriff's Office in connection with the killings. The article quoted Sheriff Hedrick as saying, "We believe we have the right person." Another article reported on Mr. Watson's prior conviction and sentence. An article published by the *Concordia Sentinel* related that Mr. Watson was fighting extradition to Louisiana. According to Lieutenant Groh, Mr. Watson allegedly shot Megan and her minor son with and AR-15, and Lieutenant Groh noted that Mr. Watson was out on probation at the time. The defense also introduced

several articles pertaining to Mr. Watson's previous manslaughter conviction which were published prior to Megan and LaFrederick's deaths. Additionally, the defense introduced social media comments which were varied in nature.

On February 26, 2020, the trial court held a hearing on the motion. Defense counsel noted there would be an "opportunity . . . in Voir Dire . . . to see just how damaging this information is[,]" but he argued the publicity was "highly prejudicial." In contrast, the State agreed that people were upset about the killings but urged the trial court to consider how much time had passed since the homicides and to consider the number of recent homicides in Concordia Parish. Regarding the social media comments, the State argued the defense had not shown the commenters lived in the jurisdiction and were, thus, representative of Concordia Parish. The State suggested the issue was not only whether prospective jurors had heard about the case, but also whether they had formed an opinion as to Mr. Watson's innocence or guilt. The State concluded the defense failed to meet its burden of proving Mr. Watson would not be able to obtain an impartial jury or a fair trial in Concordia Parish but reasoned the motion could be re-urged during voir dire if it became evident that an impartial jury could not be impaneled due to prior knowledge of the case. Following arguments, the trial court denied the motion for the reasons submitted by the State and found the voir dire process would bring forth any issues.

Defense counsel did not object to the trial court's ruling, nor did he re-urge the motion before, during, or after voir dire as suggested by the State and trial court. Consequently, defense counsel adduced no further evidence in support of his motion, relying instead on the voir dire process to uncover the existence of any community prejudice. We will now address the applicability of the *Bell* factors to the present case as the supreme court did in *Magee*.

*Nature and Degree of Publicity*

13

The first factor instructs courts to consider the nature and degree of publicity. The newspaper articles relied upon by Mr. Watson were factual, rather than inflammatory. Admittedly, some of the social media comments were incendiary or inflammatory; however, there is no proof that the people who posted the comments are representative of the Concordia Parish community, and there is no proof that those people are residents of Concordia Parish. *See State v. Wilhite*, 55,023, p. 12 (La.App. 2 Cir. 5/17/23), ___ So.3d ___ (2023 WL 3486253).

A review of voir dire reveals that only a handful of the prospective jurors had heard of either the crime, the victims, or Mr. Watson. Some prospective jurors stated they recognized Megan from shopping at the local Dollar General where she worked or knew members of the McCoy family. One prospective juror had previously worked with Megan. Both the State and defense counsel questioned the prospective jurors regarding whether they had seen any newspaper articles or social media posts about the homicides; no prospective juror indicated that they had. As the State argues to this court, voir dire shows "the vast majority of the panel was not familiar with the case."

*Connection of Government Officials with Publicity*

To the extent the police contributed to the publicity, there was no allegation of a strategy by government officials to prejudice the public mind against Mr. Watson with the release of publicity. Moreover, any comments by police in this case did not equate to the "actual prejudice" that must be proven to require a change of venue. Mr. Watson did not establish the existence of such prejudice in the collective mind of the community that a fair trial was impossible. Thus, in the instant case, if Mr. Watson was prejudiced from the comments of any government officials, such prejudice diminished by the start of his trial.

*Length of Time Between Publicity and the Trial*

14

As the State points out, the motion for change of venue was filed on February 12, 2020, over a year before trial commenced in this case. The newspaper articles and social media comments about Megan and LaFrederick's deaths were posted the week after the homicides, and some of the newspaper articles about Defendant's prior conviction predated the homicides. Due to the length of time between the publicity and the trial, Mr. Watson has failed to demonstrate the publicity affected his right to an impartial jury.

*Severity and Notoriety of the Offenses*

Defense counsel argues the media coverage of the homicides "in a small, rural community was destined to . . . prejudice many of the citizens" against Mr. Watson, especially given that LaFrederick was twelve years old. Although the severity and notoriety of the offenses was significant, the current murder trial presents facts that are not dissimilar from other first-degree murders in Concordia Parish. In *State v. Lewis*, 22-346 (La.App. 3 Cir. 12/14/22), 354 So.3d 213, the defendant robbed the victim and shot him in the back of the head before dragging the victim's body down into a ravine; he was convicted of first-degree murder following a jury trial. Lewis' co-defendant was tried separately and convicted of second-degree murder. *State v. Tennessee*, 22-668 (La.App. 3 Cir. 2/23/23), 358 So.3d 565. In *State v. Bell*, 22-109 (La.App. 3 Cir. 10/19/22) (unpublished opinion) (2022 WL 10820938), the defendant was convicted of three counts of first-degree murder after he beat and stabbed an elderly bedridden woman and her two sons to death. Considering these cases, the severity and notoriety of the present offenses is not unprecedented in Concordia Parish.

*Area from which the Jury is to be Drawn*

For this factor, Mr. Watson alleges the city of Clayton has a population of less than 600 residents and, of the population, many either knew the decedents or

15

were related to them. Mr. Watson also alleges the surrounding areas of Ferriday and Vidalia have a population of less than 3,100 residents respectively. Additionally, defense counsel points out that one of the district attorney investigators was related to the decedents. The State argues that the defense's repeated reference to the small populations of the "community" of Clayton and the surrounding areas of Ferriday and Vidalia is misleading as it ignores the population of Concordia Parish as a whole, which is over 18,000 residents.

When analyzing this factor in *Magee,* the supreme court considered the size of the jury pool summoned for the case. Because the jury pool consisted of 500 people, with only 43% of the jurors polled having heard something about the case and only 11% being removed for having formed an opinion about Magee's guilt, the supreme court found that the large jury pool prevented a dearth of qualified prospective jurors. The record in this case is silent as to the size of the jury pool in the present case. Therefore, the record is insufficient to review this factor.

*Other Community Events that Either Affect or Reflect the Community's Attitude*

Regarding this factor, defense counsel asserts that the victims' family took an active role in making discriminatory comments about Mr. Watson's involvement in the shooting. However, Mr. Watson fails to point to a single comment made by the victims' family in the record. Mr. Watson also notes that the newspaper articles and social media comments were posted months prior to the COVID-19 pandemic "which forced the entire country to retreat into the safety of their homes and to resort to online and social media sources for information." While that may be true, Mr. Watson has not proven this prevented him from obtaining a fair and impartial jury.

*Any Factors Likely to Affect the Candor and Veracity of the Prospective Jurors*

16

Mr. Watson implies that excused jurors discussed their knowledge of the victims' deaths with other panel members during breaks. He further alleges that the guilty verdicts—which were rendered less than twenty minutes after the jury retired to deliberate—were "the result of the jury's eagerness to punish the man whom the decedents' family have accused, condemned, and berated in print and social media" rather than overwhelming evidence against Mr. Watson. This, however, is merely speculation. There is nothing in the record to prove any improper conversations took place which could have tainted the jury.

After considering all the factors in the present case, Mr. Watson has failed to demonstrate the existence of an overriding prejudice in the community that affected his right to an impartial jury. Furthermore, the media's discussion of Mr. Watson's manslaughter conviction does not warrant a different result in this case. As the United States Supreme Court stated in *Murphy v. Florida,* 421 U.S. 794, 799, 95 S.Ct. 2031, 2036 (1975), "juror exposure to information about a state defendant's prior convictions or to news accounts of the crime with which he is charged alone" do not presumptively deprive the defendant of due process. Rather, the "totality of circumstances" must be examined to determine whether the defendant received a fair trial. *Id.* Similarly in *State v. Connolly,* 96-1680 (La. 7/1/97), 700 So.2d 810, the supreme court did not presume prejudice simply because a newspaper article mentioned that Connolly was involved in an unrelated murder. *See also State v. Comeaux,* 514 So.2d 84 (La.1987), and *State v. Lee*, 05-2098 (La. 1/16/08), 976 So.2d 109, *cert. denied*, 555 U.S. 824, 129 S.Ct. 143 (2008).

Accordingly, we find that Mr. Watson has failed to show that the trial court abused its discretion in denying the motion to change venue in the present case.

17

IV.

## **<u>CONCLUSION</u>**

For the foregoing reasons, Mr. Watson's conviction and sentence are affirmed. The trial court is instructed to amend the court minutes to correctly reflect that the trial court ordered the two life sentences to be served consecutively, and defendant be provided with notice of said amendment to the minutes within thirty (30) days.

**AFFIRMED.**